331 So.2d 16 (1976)
STATE of Louisiana
v.
Roosevelt KAUFMAN.
No. 56806.
Supreme Court of Louisiana.
March 29, 1976.
Rehearing Denied May 14, 1976.
*18 David W. Robinson, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., James E. Boren, Ralph Roy, Asst. Dist. Attys., for plaintiff-appellee.
MARCUS, Justice.
Roosevelt Kaufman was indicted by the grand jury for the Parish of East Baton Rouge for the murder of Jessie Guthrie on June 9, 1970 in violation of La.R.S. 14:30. After trial by jury on June 2, 1975, he was found guilty as charged and was subsequently *19 sentenced to life imprisonment at hard labor. On appeal, defendant relies upon seven assignments of error for reversal of his conviction and sentence.[1]

ASSIGNMENT OF ERROR NO. 1
Defendant contends that the trial court erred in failing to sustain his motion for a directed verdict of acquittal made after the close of the state's case. La.Code Crim.P. art. 778 (1966).[2]
This court can find error in the trial judge's denial of a motion for a directed verdict and reverse the conviction only when there is no evidence of the crime or an essential element thereof. State v. Douglas, 278 So.2d 485 (La.1973).
The state produced evidence to show that Jessie Guthrie and his son-in-law, John House, were night service station attendants at the Fina station, 7554 Scenic Highway in Baton Rouge, the scene of the robbery-murder. These men were last seen by a customer at about four o'clock on the morning of June 9, 1970. When the day attendant arrived at about five twenty in the morning, he found the station empty, the cash drawer gone and the cigarette bay open. An inventory showed that about one hundred and thirty packs of cigarettes and $100 in cash were missing. Keys and a money wrapper kept in the cash drawer were also gone. The body of Jessie Guthrie was found in the mid-morning hours of June 9 floating in a diversion canal in Scotlandville, East Baton Rouge Parish. Three spent shotgun shells (.410 gauge), a money wrapper and a set of keys were recovered from the area near where the body was found. On June 11, the body of John House was found floating in the same canal at approximately the same location. According to the coroner, Guthrie died from gunshot wounds to the neck from which pellets were removed. House died of a gunshot wound of the brain; no pellets were taken from him. The time of death was established as between 4:00 and 6:00 a.m. on June 9.
Testimony was adduced that on the day before the robbery-murder (June 8), Roosevelt Kaufman, Iley Dotch and Delores Williams were together from nine o'clock in the morning until six o'clock that evening drinking and "popping pills" in a recreation park. Kaufman's car was used by them. Willie Holmes, in his own car, accompanied them to the park. After leaving the park, Holmes discovered that his.410 sawed-off shotgun and shells were missing from the trunk of his car. Later that evening, Holmes met up with Kaufman, Dotch and Williams. While together a shooting incident occurred wherein Holmes obtained his gun out of Kaufman's car and fired it into the air. They then proceeded to a service station (Kaufman, Dotch and Williams in Kaufman's car, and Holmes in his car) where Dotch left the gun and three shells with an attendant. According to the attendant, Dotch and two others came back and got the gun and shells about two hours later. Kaufman, Dotch and Williams then met Holmes at a *20 bar where they stayed and talked until about one o'clock in the morning (June 9). During this period, Kaufman was lying on the seat of his car. They then proceeded to a closed service station (Delores Williams driving Kaufman's car, with Dotch and Kaufman, and Holmes driving his car) where, according to Holmes, Kaufman and Dotch attempted to break into a soft drink machine. Holmes protested, and the three drove off in Kaufman's car. Holmes drove around for a short while looking for them; however, not finding them, he proceeded to his wife's house where he arrived about two o'clock in the morning.
Feaster Dorsay, the operator of King's Motel, located about two blocks from the Fina station and about a ten-to-fifteen minute drive to where Guthrie's body was recovered, testified that about three o'clock in the morning of June 9, Delores Williams checked into Room 22 and thereafter left in a car. About forty-five minutes later (in the vicinity of four o'clock), after having retired for the night in a room next to Room 22 (Room 23), he was awakened and saw Delores return with a man whom he identified as Kaufman. Although Dorsay did not see Kaufman and Delores leave thereafter. he testified that there was a door adjacent to Room 22 through which an exit could be made without his knowledge. About six that same morning, a man identified as Dotch came to the motel and inquired as to the location of Room 22. Dotch purchased a brown bag from an employee of the motel.
A girl friend of Kaufman, Patricia Butler, with whom he was living, stated that on the night of the murder Kaufman did not come home. However the next morning he came with Dotch and, in the presence of Kaufman, Dotch gave Patricia a brown bag containing about fifteen or twenty packs of cigarettes. Patricia learned that Kaufman had spent the night in Room 22 of the King's Motel with Delores Williams. Patricia, having also heard that the cigarettes left by Dotch were stolen, had someone hide them in the loft of her house. Accompanied by her mother and Kaufman's mother, Patricia went to Room 22 and found cigarette cartons (three or four) hidden under the mattress. The cartons were of similar brands given to her by Dotch and taken from the service station. The same three people then went to the diversion canal where the body of Guthrie had been found. There, Patricia found a rag-like diaper which had been left by her sister in Kaufman's car on the day before the crime. She took the diaper home and burned it. The officer investigating the crime testified that he had seen the diaper in the location where Patricia had found it but had left it there. A picture of the crime scene showed a diaper.
Willie Holmes testified that he arrived home about two o'clock on the morning of the crime and remained there until seven. Having heard that a .410 shotgun had been used in connection with the robbery-murder of the service station attendants, he proceeded to look for Kaufman. After finding him, he asked Kaufman if he had anything to do with the killings, and Kaufman replied that they did. Kaufman told Holmes to get rid of the gun. Holmes then went to Dotch's sister's house, got the gun and buried it under a tree on the road to Baker. On June 10, when he heard that Kaufman had been arrested by the police, Holmes retrieved the gun and took it to a shallow canal where he disposed of it. Later, upon directions supplied by him, the police recovered the .410 shotgun.
In view of these facts and circumstances, there was some evidence upon which the jury could conclude that Kaufman was guilty of the crime charged. The trial judge correctly denied defendant's motion for a directed verdict of acquittal. This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant contends that the trial judge erred in permitting the state's attorney to refer to the law of conspiracy, over defendant's *21 objection, in his opening statement to the jury and in charging the jury with the law of conspiracy, over defendant's objection, when defendant had not been charged with the crime of conspiracy. Defendant further argues that the trial judge erred in permitting the state to bring an alleged coconspirator (Dotch) into the courtroom in furtherance of its "theory of conspiracy." In regard to this latter contention, defendant's motion for a mistrial was denied by the trial judge.
Defendant was not charged with the inchoate crime of conspiracy (La.R.S. 14:26). Rather, he was on trial for murder (La.R.S. 14:30). Conspiracy to commit the completed offense is not a responsive verdict to the completed offense. La.Code Crim.P. arts. 814 and 815. Nevertheless, when a defendant is on trial for the completed offense, evidence of the crime of conspiracy is permitted under the rule of evidence set forth in La.R.S. 15:455 which provides as follows:
Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established.

(Emphasis added.)
Recently, we considered the import of La.R.S. 15:455 during various stages of trial of a completed crime. State v. Brown, No. 56,690, 326 So.2d 839 (La.1975); State v. Carter, No. 56,594, 326 So.2d 848 (La.1975). Carter and Brown were alleged to have committed armed robbery of the proprietor of a small grocery in Baton Rouge. Although they were tried together, their appeals were docketed and considered separately by this court. In Brown, we held that, whenever more than one person is charged with the commission of a crime and the state intends to prove a conspiracy existed in order to take advantage of La.R.S. 15:455, it was not improper for the district attorney to refer to the law of conspiracy in his opening statement to the jury. Further finding sufficient evidence to establish a prima facie case of conspiracy to commit a robbery, we found no error in the charge given by the trial judge on the law of conspiracy. In Carter, we held that, since there was no evidence that Carter was part of a conspiracy to commit armed robbery, the trial judge erred in ruling that the determination whether there was a conspiracy between Brown and Carter was a question solely for the jury. Hence, we reversed Carter's conviction and sentence.
La.R.S. 15:455 clearly states that to have the effect set forth therein, a "prima facie case of conspiracy must have been established." The type of proof necessary to establish a conspiracy may be by direct or circumstantial evidence. The trial judge must be satisfied that a prima facie showing of conspiracy has been made before La.R.S. 15:455 is applicable. Thereafter, the existence of a conspiracy becomes a question of fact for the jury.
First, we do not find that the trial judge erred in permitting the state's attorney to refer to the law of conspiracy in his opening statement to the jury. State v. Brown, supra.
Secondly, a review of the record indicates evidence placing defendant Kaufman with one of the perpetrators, Dotch, before and after the commission of the crime. Proof was adduced that Kaufman and Dotch had been together since nine in the morning on the day before the crime was committed. They were last seen by Holmes about one or one thirty on the morning of the crime rifling a soft drink machine in a closed gas station. Kaufman was seen with Delores Williams in a motel in close proximity to the place of the robbery-murder *22 shortly before the time of its happening. The murder weapon, a .410 sawed-off shotgun, was in the car occupied by defendant, Dotch and Williams a few hours before the crime was committed. About six that morning, Dotch was seen at the motel and indicated a prior knowledge that Kaufman and Williams were in Room 22. Kaufman and Dotch were also together later that morning (about 8:30) when Dotch presented Patricia Butler with a bag of cigarettes similar to those taken from the robbed service station. Holmes received word that a robbery-murder had been committed with a .410 shotgun. About nine or ten o'clock on the same morning, Holmes saw Kaufman and asked him if it was true that "they" had robbed the service station and killed those people with his gun. Kaufman's reply was "yeah." Kaufman then told Holmes to get rid of the gun which had been placed at Dotch's sister's house. Empty cartons of cigarettes were found under the mattress in the motel room occupied by Kaufman and Williams. A diaper which had been in Kaufman's car the day before the crime was found in the area where the body of Guthrie was discovered.
We are satisfied that a prima facie case of conspiracy was established. Hence, the trial judge did not err in charging the jury with the law of conspiracy. It was clearly the law applicable to the case. La.Code Crim.P. art. 802(1) (1966).
Finally, defendant's complaint that it was reversible error to permit the state to bring Dotch into the courtroom in furtherance of its "conspiracy theory" is without substance. The state had Dotch brought in so that John Holden, the gas station attendant, could identify him as the man who brought the .410 shotgun and shells to him and later came back for the gun and shells on the night before the murder. Later, Dotch was brought in so that Feaster Dorsay, operator of the King's Motel, could identify him as the man who asked where Room 22 was located at about six o'clock on the morning of June 9, 1970. Clearly, Dotch's identity in each instance was relevant and material. Hence, the trial judge did not err in denying defendant's motion for a mistrial.
In sum, Assignment of Error No. 2 is without merit.

ASSIGNMENT OF ERROR NO. 3
Defendant contends that the trial judge erred in finding Patricia Butler competent to testify against him. He contends that their private conversations were privileged. Defendant also argues that, since Patricia Butler would be incompetent to testify in other jurisdictions which recognize the validity of a common-law marriage, Louisiana's failure to do so denies him the equal protection of laws guaranteed by the fourteenth amendment.
The law applicable to the competency of a husband and wife to testify against each other in a criminal trial is embodied in La.R.S. 15:461 which provides in pertinent part:
The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but;
(1) Private conversations between husband and wife shall be privileged.
(2) Neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding, against the other.
. . .
The record affirmatively shows that Patricia Butler had never been married to defendant but had been living with him for some four years prior to 1970. By her own admission, she had also lived with another man during this period.
This court has previously held that a concubine is competent to testify, the fact of concubinage bearing only on *23 the credibility of the witness-concubine, and not on her competency. State v. Brown, 28 La.Ann. 279 (1876); Meunier v. Couet, 2 Mart. (O.S.) 56 (1811). La.R.S. 15:461 uses the terms "husband" and"wife." In view of the relationship between Roosevelt Kaufman and Patricia Butler, they are not "husband" and "wife" as defined under our law. Hence, Patricia Butler was competent to testify and her private conversations with Kaufman were not privileged. Also, laws of the various states do not have to be uniform. Thus, we find no violation of the equal protection clause of the fourteenth amendment on this account. Assignment of Error No. 3 is without merit.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant challenges the alleged badgering of a witness, Patricia Butler, by the prosecutor and the use by him of the following language in the presence of the jury: "I don't want her pussyfooting with me" and "it"s obvious she's hostile."
From the record, it is apparent that a misunderstanding developed during the questioning of Patricia concerning what she meant in her testimony by "loose" cigarettes. This was in relation to the cigarettes given to her by Dotch on the morning of the crime. It was at this time that the prosecutor used the objected-to language above quoted. The trial judge, in an effort to clear up the meaning of "loose," retired the jury and interrogated Patricia himself. During this time, the prosecutor made a remark indicating that, if the witness wanted to spend the night at her home, she had better tell the truth on the witness stand. At about this time, the witness began to weep. After a short pause, the witness appeared to regain her composure, and the jury was returned to the courtroom. However, after a few innocuous questions, she became ill and had to be excused.
Initially, it should be noted that Patricia Butler was a state witness. It was also observed by the trial judge that he considered her evasive. Thus, the reference by the prosecutor that she was "pussyfooting" or perhaps "hostile" was not objectionable. The other remark by the prosecutor, even if considered objectionable, was made out of the presence of the jury. Therefore, defendant could suffer no prejudice thereby.
In the discipline of his court, the trial judge is given wide discretion in controlling the examination of witnesses. La.R.S. 15:275. Unless an abuse of this discretion is shown, this court will not reverse a conviction on this account. We find no such abuse here. Hence, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 5
The coroner, after testifying as to his examination and the cause of death of the victim, Jessie Guthrie, was questioned as to the cause of death of John House, the other victim in the robbery-murder not named in the indictment charging defendant, and for which he was being tried. Defendant objected on the ground of relevancy. The state contended that evidence of House's death was admissible as part of the res gestae. Defendant's objection was overruled. He claims reversible error as a result of this ruling.
In State v. Jefferson, 284 So.2d 882 (La.1973), the accused was charged with and tried for robbing Ledesma. At the same time as Ledesma was robbed, a bystander named Mader was robbed. During trial, reference was made to this other crime. We held that the other crime's circumstance was an immediate concomitant of the offense with which the defendant was charged and formed, in conjunction with it, one continuous transaction. Therefore, it was admissible as part of the res gestae.
*24 In the instant case, there was evidence that Guthrie and House, attendants at the service station, were both missing on the morning of the robbery-murder. Therefore, evidence of the death and cause of death of House, occurring at the same time as Guthrie, was part of one continuous transaction. The evidence was properly admitted as part of the res gestae. La.R.S. 15:447, 15:448; State v. Major, 318 So.2d 19 (La.1975); State v. Matthews, 292 So.2d 226 (La.1974); State v. Witherspoon, 292 So.2d 499 (La.1974); State v. Leichman, 286 So.2d 649 (La.1973); State v. Jefferson, supra.
Assignment of Error No. 5 is without merit.

ASSIGNMENT OF ERROR NO. 6
Defendant contends that his privilege against compulsory self incrimination was violated by certain questions propounded by the prosecutor on cross-examination when he took the stand in his own defense. At two previous trials, defendant had not taken the stand. He alleges that these questions were directed at his failure to give statements to investigating officers and to testify at his previous trials.
On cross-examination, defendant was questioned by the prosecutor concerning information given by him to Patricia Butler, with whom he was living. Patricia had previously testified that: Kaufman had visited her on the morning of the crime at which time Dotch had given her some cigarettes; she later heard these cigarettes were stolen and had them hidden in the loft of her house; she had gone to Room 22 of the King's Motel and discovered empty cartons of cigarettes under the mattress; and she recovered a baby diaper from the area where Guthrie's body was discovered and had burned it. The prosecutor proceeded to question defendant regarding what defendant had told Patricia. The following colloquy took place:
Q. Yeah, well, you want to tell us what you told her about this thing?
A. What I told who?
Q. What you told your wife . . .
A. I didn't tell my wife anything.
Q. Do you know why your wife went to the King Motel and looked under the mattress in Room 22?
A. No, I don't.
Q. Do you know why she went down there and got that baby diaper and burned it?
A. No, I don't.
Q. Because you told her.
A. I didn't tell Patricia anything.
Q. You told Jessie Lee Butler.
A. I didn't tell Jessie Lee Butler anything.
Q. When is the first time that you have toldnow, we are talking about five years agowhen is the first time that you have publically [sic] made the statement that you are making here today?
A. I never made a statement like
Q. You never did? Why not?
A. Because I don't know anything about it.
Q. Sounds like to me you know plenty about it.
A. I don't know anything.
Q. Sounds like to me . . .
A. You trying to make me know something about it.
MR. ROBINSON: Your Honor, Your Honor . . .
Q. Sounds like to me you were dead drunk . . .
MR. ROBINSON: Wait a minute, Your Honor . . .
Q. When this thing was going on . . .

*25 THE COURT: Wait, now.
MR. ROBINSON: Mr. Roy is going completely overboard. He's arguing with this witness. I object to all this.
THE COURT: Let the witness complete his answer, Mr. Roy.
Q. Did you telldid you tell anybody investigating this case who approached you what you are telling us here today?
A. No, I didn't.
Q. You like it behind bars?
A. What's that?
Q. You're enjoying your stay here with us?
MR. ROBINSON: Your Honor, Your Honor, just a moment. I want to object to this line of testimony. It's entirely improper. This is this witness' day in Court and he's taken the stand, and he's testifying and . . .
THE COURT: The objection is overruled.
MR. ROBINSON: That's sufficient. I want to assign that, the remarks of counsel and my objection to them and the Court's ruling as error.
This questioning by the prosecutor of defendant represents a proper inquiry as to whether defendant was the source from which Patricia Butler had received the information upon which she acted during her investigation of the crime. These questions were not directed at defendant's failure to give statements to investigating officers[3] or to testify at his previous trials. Furthermore, no objection was made after the alleged objectionable questions and answers. The first objection was that the prosecutor "is going completely overboard" and is "arguing with the witness." The other objection was made when the prosecutor asked defendant if he was enjoying his stay with the state. The ground for this objection was that this line of questioning was "entirely improper." It is evident that there was no objection that any of the questions was in reference to defendant's failure to give statements to investigating officers and to testify at his previous trials. Taken in its proper context, the questions do not convey such a meaning.
Accordingly, we find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. 7
Defendant contends that the trial judge erred in denying his motion to quash the indictment on the ground that it was returned by an improperly composed grand jury. The basis of the motion is that no women served on the grand jury.
The grand jury returned an indictment against defendant in 1970 when article 402 of the Louisiana Code of Criminal Procedure was effective and provided for exemption of women for jury service except upon written declaration to serve.[4] After defendant's first conviction and sentence were reversed on appeal and the case remanded for a new trial, a motion for severance filed on September 10, 1973 was granted. Thereafter, on September 17, 1973, the indictment presently under consideration was filed. After Kaufman's *26 conviction and sentence on retrial were again reversed on appeal and the case remanded for a new trial, the present trial was held on June 2, 1975.
On January 21, 1975, the United States Supreme Court handed down its decision in Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) holding the Louisiana provisions for exemption of women unconstitutional. Subsequently in Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), the Court held that the Taylor ruling is not to be applied retroactively, as a matter of federal law, to convictions obtained by juries empanelled prior to the date of the Taylor decision. This court has held that consonant with Daniel, the Taylor ruling would not be applied retroactively. State v. Rester, 309 So.2d 321 (La.1975).
This court denied a writ application in State v. Parker, 308 So.2d 284 (La.1975), involving a refusal by the trial judge to quash a grand jury indictment returned in 1973 before Taylor was decided but where the case was scheduled for trial after the decisions in Taylor and Daniel and the effective date of the new Louisiana Constitution of 1974. Later, in State v. Gaines, 315 So.2d 298 (La.1975), this court affirmed the trial court's quashing of a grand jury indictment which was returned on January 6, 1975, after the effective date of the new constitution.
Article XIV, § 23 of the Louisiana Constitution of 1974 provides:
All writs, actions, suits, proceedings, civil or criminal liabilities, prosecutions, judgments, sentences, orders, decrees, appeals, rights or causes of action, contracts, obligations, claims, demands, titles, and rights existing on the effective date of this constitution shall continue unaffected. All sentences as punishment for crime shall be executed according to their terms.
There is no merit to defendant's contention. Since Kaufman was indicted by the grand jury prior to the effective date of the new constitution, the "proceedings" were "existing" on that date and continued unaffected. This is in accordance with our ruling in State v. Parker, supra. Likewise, it is not contrary to Gaines wherein the indictment was returned after the effective date of the new constitution. In Gaines, the "proceedings" had not commenced prior to the effective date of the new constitution. Therefore, they were not "existing" on that date. This is also in accordance with the Daniel holding in regard to Taylor and our decision in Rester. Hence, the trial judge correctly denied defendant's motion to quash the grand jury indictment. There is no merit in this assignment of error.

DECREE
For the reasons assigned, the conviction and sentence are affirmed.
SANDERS, C.J., and DIXON, J., concurs.
TATE, J., assigns additional concurring reasons.
CALOGERO, J., dissents and assigns reasons.
TATE, Justice (concurring).

I.
The most troublesome issue presented to this court arose from the district attorney's reference to the law of conspiracy in his opening statement and from the trial judge's charge to the jury on the substantive law of conspiracy. For the following reasons, I concur with the judgment of this court.
A criminal conspiracy to commit any given offense is an inchoate crime, separate and distinct from the completed criminal conduct. When the intended criminal conduct has been completed, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one *27 shall not bar a prosecution for the other. La.R.S. 14:26. Also, a conspiracy to commit the completed offense is not a responsive verdict at a trial for the completed offense. La.C.Cr.P. arts. 814 and 815.
However, when a defendant is on trial for the completed offense, reference to the law of conspiracy may be relevant and permissible only to allow the state to take advantage of the evidentiary exception to the hearsay rule contained in La.R.S. 15:455. That statute provides:
"Each coconspirator is deemed to assent to or to commend whatever is said or done in furtherance of the common enterprise, and it is therefore of no moment that such act was done or such declaration was made out of the presence of the conspirator sought to be bound thereby, or whether the conspirator doing such act or making such declaration be or be not on trial with his codefendant. But to have this effect a prima facie case of conspiracy must have been established."
This court recently re-examined the law permitting reference to the law of conspiracy in the various stages of a trial for the completed offense. See: State v. Brown, No. 56,690, 326 So.2d 839 (La.1975) and State v. Carter, No. 56,694, 326 So.2d 848 (La., 1975). Carter and Brown were tried together for the armed robbery of a small grocery in Baton Rouge. Their appeals to this court were docketed separately and considered individually by this court.
A majority of this court affirmed the conviction in Brown, while a separately constituted majority reversed the conviction in Carter. In Brown, as in the present case, the court found no error in the district attorney's mentioning of the law of conspiracy where more than one person was charged with the commission of the crime and the state intended to prove a conspiracy did exist in order to take advantage of the evidentiary rule of La.R.S. 15:455, and where a prima facie showing was later made during the trial.
In Carter, we held that while the question of the existence of a conspiracy was a question of fact for the jury to decide, rulings on the introduction of evidence, including the admission or acts of declarations of one coconspirator against another under La.R.S. 15:455, are mixed questions of law and fact. The trial court must first decide whether a prima facie showing has been made in order to determine whether a defendant will be charged with the responsibility for the acts and declarations of another. After such an initial determination, the existence of the conspiracy becomes a question of fact for the jury. Since this court found no evidence of a conspiracy in Carter, much less a prima facie case, the conviction was reversed.
In the present case, the writer agrees with the majority opinion that a prima facie showing of conspiracy was made. Thus, the references to the law of conspiracy (both the substantive law, La.R.S. 14:26, and the evidentiary rule, La.R.S. 15:455) were permissible: There was more evidence than the mere fact that the defendant was present with the perpetrator before and after the commission of the offense, and that the offense may have been committed by more than one person.
However, prosecutors may well avoid the practice of instructing the jury as to the law of conspiracy in their opening statements in every case where the offense was committed by more than one person, for, if during the trial there is no prima facie showing of a conspiracy, the prejudicial impact of the earlier reference may necessitate a mistrial (or a reversal of a subsequent conviction).
In his charge to the jury in the present case, the trial judge mentioned only the substantive law of conspiracy, La.R.S. 14:26, and did not refer to the evidentiary rule contained in La.R.S. 15:455. The only relevance of charging the jury as to the substantive law of conspiracy is to allow them to determine the factual question as to whether a conspiracy existed so that the *28 acts and declarations of a co-conspirator might be used against the defendant. Failure to instruct the jury as to the evidentiary rule after mentioning the substantive law constituted error. However, in the present case the error does not require reversal of the conviction because the jury had been informed of the evidentiary article shortly prior to the charge. It should be be noted that the substantive law of conspiracy alone is irrelevant and does not constitute the law applicable to the case when the defendant is being tried for the completed offense.

II.
In cross-examination of the defendant, the district attorney asked him, "When is the first time that you have publicly made the statement that you are making here today?", and "Did you tell anybody investigating this case who approached you what you are telling us here today?" These questions would normally constitute reversible error as an improper reference to the defendant's exercise of his Fifth Amendment privilege against self-incrimination.
The writer cannot agree with the majority's statement that the questions "were not directed at the defendant's failure to give statements to the investigating officers or to testify at his previous trials." However, the Louisiana jurisprudence and statutory authority is clear that, absent a contemporaneous objection stating the grounds which defendant relies on, this court will not review the objection. This requirement is to enable the trial court to rule intelligently or to correct an error at the time of the objection and to facilitate this court's review of the objection on appeal. See: La.C.Cr.P. arts. 841 and 843 (1974); State v. Powell, 325 So.2d 791 (La.1976); State v. Thornton, 284 So.2d 753, 756 (La.1975), and the cases cited therein.
The majority opinion correctly relies on the perhaps unduly technical Louisiana procedural requirements, which in my view unnecessarily relegate to post-conviction proceedings the issue of whether there is an intelligent waiver of a constitutional right. Nevertheless, at least until changed, this applicable procedural rule prevents review at this time of the substantial contention here raised.

Conclusion
Accordingly, with the reservations above set forth, the writer concurs.
CALOGERO, Justice (dissenting).
I respectfully dissent from the majority's affirmance of the conviction of this defendant because I believe several substantial errors occurred at his trial which require this Court to order a new trial for him which would be free of violations of his statutory and constitutional rights.
Initially I do not believe that the majority's treatment of the conspiracy issue is correct. See assignment of error number 2. In order for a trial judge to properly charge a jury on the law of conspiracy, conspiracy must have been part of the law applicable to the case (C.Cr.P. art. 802) either because the defendant was charged with the crime of conspiracy to commit a particular offense, or because the state had been allowed to utilize the provision of R.S. 15:455 which makes a defendant who is part of a conspiracy bound by the acts and declaration of a co-conspirator if they are done in furtherance of the conspiracy. Neither of these two reasons was present in the case before us. Defendant Kaufman was not charged with conspiracy to commit a crime, R.S. 14:26; he was on trial for murder, R.S. 14:30. Also, the procedural article, R.S. 15:455, was not utilized by the state in this trial, nor was it mentioned by the judge in his charge to the jury. Moreover, in order to take advantage of this procedural article, the state must establish a prima facie case of conspiracy. In the case at hand there was absolutely no evidence that Kaufman was engaged in a conspiracy to rob or to murder. There was merely evidence that *29 Kaufman was with Dotch before and after Guthrie was murdered. Proof that a defendant is seen with a person who committed a crime both before and after the crime is committed does not, by itself, establish a prima facie case that the defendant was involved in a conspiracy to commit the crime.
I believe that the judge's instructions were not only violative of C.Cr.P. art. 802 and R.S. 15:455 but were also highly prejudicial to Kaufman, who was painted as a "bad man" because he associated with Dotch, the man who apparently killed Jessie Guthrie. Therefore, I feel that this Court should have reversed Kaufman's conviction and ordered a new trial.
In cross-examination of the defendant, the district attorney asked him these two questions: "When is the first time that you have publically [sic] made the statement that you are making here today?" and "Did you tell anybody investigating this case who approached you what you are telling us here today?" These questions clearly constituted reversible error because they refer to the defendant's exercise of his fifth amendment privilege against self-incrimination. The first refers to Kaufman's failure to testify at his two earlier trials, and the second refers to Kaufman's failure to give a statement to the police who were investigating Guthrie's murder. See United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975).
Apparently the majority feels that the merits of this argument are not before the Court because 1) the questions do not refer to the failure of the accused to testify at his previous trials and to give a statement to police and 2) defense counsel did not object to the questions.
The questions clearly referred to the previous silence of the accused during his trials and his interrogation by police. As for the problem of the objections, whatever merit there may be to the majority's position that defendant's attorney did not properly object to the question about defendant's failure to testify at his previous trials, there is no doubt in my mind that defense counsel did properly object to the question about Kaufman's failure to give a statement to the police. Defense counsel repeatedly objected, as is revealed in the record quoted in the majority opinion, and was repeatedly interrupted by the prosecutor and the court. He objected to the whole "line of testimony" because, he said:
"It's entirely improper. This is the witness' day in court and he's taken the stand, and he's testifying and . . . ."
At that point he was interrupted by the judge who overruled his objection. Defense counsel was obviously cut off while he was in the process of directing his objection toward the infringement of defendant's rights under the fifth amendment. I feel, therefore, that the majority's treatment of this matter is overly-technical. See my dissent in State v. Calloway, 324 So.2d 801 (La.1975).
Furthermore, although my reasons for dissenting relate to the two errors previously discussed, I do not agree with the majority treatment of assignments number 4 (which deals with the impeachment of a state witness by the prosecutor absent his laying a foundation) and number 5 (which deals with the prosecutor's questioning of a coroner about the cause of death of a person other than the victim of the crime with which defendant was charged).
For these reasons, I respectfully dissent.
NOTES
[1] Originally, Kaufman and Iley Dotch were charged with murder and jointly tried, convicted and sentenced to death. On appeal, their convictions and sentences were reversed and the case remanded for a new trial. 278 So.2d 86 (La.1973) (on rehearing). On remand, a severance was granted and retrials were separately held. Dotch was again convicted and sentenced to life imprisonment. His conviction and sentence were affirmed on appeal. 298 So.2d 742 (La.1974). After retrial, Kaufman was again convicted and sentenced to life imprisonment. On appeal, this court again reversed his conviction and sentence and remanded for a new trial. 304 So.2d 300 (La.1974). His second retrial resulted in a conviction and sentence of life imprisonment. The present appeal is from this conviction and sentence.
[2] Act 527 of 1975 amended article 778 of the Louisiana Code of Criminal Procedure so that the trial judge may no longer direct a verdict of not guilty in a jury trial. This act was approved July 17, 1975. The amendment does not apply to this trial which occurred prior to its enactment.
[3] In United States v. Hale, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), during cross-examination at trial by the prosecutor, Hale was asked why he had not given the police his alibi when he was questioned shortly after his arrest. It was held that this questioning regarding Hale's pretrial silence was prejudicial and outweighed its probative value. The facts of Hale are clearly distinguishable from the instant case.
[4] Repealed by Acts 1974, Ex.Sess., No. 20, § 1, eff. Jan. 1, 1975. Under article V, § 33 of the Louisiana Constitution of 1974, eff. Jan. 1, 1975, women are no longer exempt from jury service. See also rule 25, eff. Jan. 1, 1975, Rules of the Supreme Court of Louisiana.