719 So.2d 556 (1998)
STATE of Louisiana
v.
Kevin JORDAN.
No. 97-KA-1756.
Court of Appeal of Louisiana, Fourth Circuit.
September 16, 1998.
*559 Harry F. Connick, District Attorney of Orleans Parish, Val M. Solino, Assistant District Attorney of Orleans Parish, New Orleans, for State.
Sherry Watters, Louisiana Appellate Project, New Orleans, for Kevin Jordan.
Before ARMSTRONG, PLOTKIN and McKAY, JJ.
*560 McKAY, Judge.

I. STATEMENT OF THE CASE

On May 2, 1996, Kevin Jordan, Henry Talley and Gerald Williams were indicted for the first degree murder of Wendell McGuffey, in violation of La. R.S. 14:30.[1] The defendant, Kevin Jordan, entered a plea of not guilty at his arraignment on May 7, 1996. After a suppression hearing, the trial court denied the defendant's motion to suppress identification on June 26, 1996. The trial court granted defendant's motion to sever on September 20, 1996. On April 1, 1997, the defendant filed a motion to quash the indictment which was denied by the trial court on the same date. After a three day jury trial, the defendant was found guilty as charged on April 4, 1997. Upon completion of the penalty phase of the trial on April 6, 1997, the jury recommended life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. On May 9, 1997, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

II. STATEMENT OF THE FACTS

On March 8, 1996 at approximately 10:00 p.m., Officer Donald LeDuff and his partner responded to a call of a shooting at 2920 Palmyra Street. When they arrived on the scene they discovered that twelve year old Wendell McGuffey had been shot in the head. They secured the scene and attempted to locate witnesses. They obtained the following information from Lamar Rickmon and Darnell Roussell:
At approximately 9:50 p.m. on March 8, 1996, Darnell Roussell was walking on Palmyra Street when he saw Anthony McGuffey. He approached and started a conversation with Anthony McGuffey and while they were speaking, a green car turned onto Palmyra. Roussell claimed there were three men in the vehicle and that the subject in the back seat was pointing at him. Another subject was driving. A third person, in the front passenger seat, was lying down in the car. Roussell was trying to look in the vehicle when he heard someone say "That's Derue right there," Roussell admitted that his nickname was "Derue". He then saw Kevin Jordan, the defendant, lean out of the front passenger window with a gun and start shooting at him and McGuffey. Roussell heard approximately five to nine shots. Both Darnell Roussell and Anthony McGuffey ran and sought cover. Roussell ran under a house. The children who were outside started running when the shots occurred. When Roussell came from under the house, he heard a lady screaming "Wendell, get up." Wendell McGuffey, had blood coming from his head. The victim subsequently died at Charity Hospital as a result of the gun shot wound.
Officer Mims also spoke with Anthony McGuffey at the scene of the shooting. McGuffey told the officer that he could possibly identify the shooter. McGuffey later identified the defendant, Kevin Jordan, in a photographic lineup as the shooter, which he later recanted.
The witnesses Roussell and Rickman identified Kevin Jordan and Dennis Camacha in the photographic lineups as the perpetrators. Roussell later at police headquarters stated that he had seen Camacha in the green vehicle earlier in the day, and that the driver of the vehicle at the shooting scene looked like Camacha and had a lot of gold teeth. Roussell was positive of his identification of Jordan. He could not see who was in the back seat.
Arrest warrants were issued and obtained for Jordan and Camacha. Following their arrests the officers took statements from Dennis Camacha and Kevin Jordan. Camacha identified Henry Talley and Gerald Williams through a photographic line-up. Subsequently, arrest warrants and search warrants were obtained for Henry Talley and Gerald Williams. Henry Talley was arrested *561 on March 14, 1996. During the search of Tally's house a .38 caliber revolver was found under Talley's pillow. The officer also found two cartridge boxes, three starter jackets and three skull caps.
On March 12, 1996, Detective Pete Bowen participated in Jordan's arrest. He and Detective Caprera transported Jordan to the Homicide office where Jordan was advised of his rights. Jordan then waived his rights and Detective Caprera obtained a statement from him. In his statement, Jordan denied any involvement in the shooting. He stated he was with his girlfriend, Shantell Nunnery, at the time of the shooting.
Gerald Williams was also arrested on March 14, 1996. Officer Mims spoke with Williams and his mother. After advising Williams and his mother of Williams' rights and informing them that Williams was under arrest for first degree murder, Williams and his mother signed the rights of arrestee form and waived his rights. Officer Dwight Deal took his statement which he later reiterated at trial. Officer Deal testified that there were no threats, coercion or inducements used to obtain the statement.
At trial Gerald Williams testified that he and Kevin Jordan obtained a green Ford Taurus from James Hill on March 7, 1996. He further testified that on March 8, 1996, he and Jordan picked up Henry Talley, in order to find Dennis "Deroue" Roussell. Williams, Talley and Jordan were in the vehicle when the victim, Wendell McGuffey, was shot. Williams then stated that Jordan shot Wendell McGuffey from the front passenger seat and that he was lying down in the back seat so no one could see him. Talley was driving the vehicle. Williams stated he heard four shots.
The same night as the shooting Officer Michael Mims observed a car parked in the front of the residence at 2920 Palmyra Street which had bloody clothes lying on the back. Another car in front of the house had a bullet hole in the left rear door. The officer also found bullet strike marks on the buildings. Two bullets were retrieved from two vehicles on the scene. One bullet was recovered from the victim.
Officer Mims took a statement from James Hill concerning the possession of the green Taurus. Hill identified the defendants Kevin Jordan and Gerald Williams in photographic lineups prepared by Officer Mims. Hill testified that on March 7, 1996, he had rented a 1993 green Ford Taurus. Later that evening, the vehicle was in the possession of Kevin Jordan and Gerald Williams. Hill never saw the vehicle again after March 7, 1996.
Ms. Leona Jordan, the defendant's mother, testified at trial that at approximately 9:30 p.m. on March 8, 1996, she received a phone call from Shantell Nunnery. Shantell told her that the defendant was at her house and he would be home soon. Ms. Leona Jordan testified that on March 8, 1996, the defendant arrived home shortly after 10:00 p.m.
There were a series of other shootings involving Kevin Jordan which were later discovered through police investigations. On August 22, 1995 police responded to a shooting in the 2500 block of Bienville. Kevin Jordan, the defendant in the instant case, was the victim of that shooting. Jordan told the officer that four guys he knew from school had driven past him and that three of the subjects had fired on him. Jordan stated that he retreated to a nearby house and returned fire with a Tech 9, a semiautomatic weapon. New Orleans Police officer Dennis Bush conducted a follow-up investigation of this shooting. Jordan one month later, in a photographic lineup, identified four subjects; Terence King, Damon Ford, Charles Daniels and Changlakong Kilvarign.
On September 24, 1995, the date the photographic lineup was conducted, Jordan was shot again. The shooting occurred in the 2400 block of Conti Street. Jordan identified Terence King as one of the perpetrators.
On January 16, 1996, Homicide Detective John Ronquillo investigated a murder which occurred in the 2400 block of Conti Street. Darryl Marshall was killed. Kevin Jordan and Gwendolyn Moliere were injured in the shooting. Terence King was arrested for Marshall's murder.

III. DISCUSSION AND RECOMMENDATION

A. Errors Patent and Assignment of Error No.1

Upon review of the record, no patent errors were found. However, the defendant *562 contends the trial court erred when it denied his motion to quash the indictment. The defendant questions the constitutionality of the statute under which he was charged and convicted. He contends the statute, as it pertains to a drive-by shooting, is vague and overly broad. The defendant also argues that the evidence is insufficient to support the allegation of specific intent to kill more than one person.
The defendant was charged with and convicted of first degree murder in violation of La. R.S. 14:30(A)(1),(3). The statute, in pertinent part, defines first degree murder as "the killing of a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of... drive-by shooting ... [or] ... [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon more than on person." "Drive-by shooting" is defined as "the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person." La. R.S. 14:37.1.
The defendant argues that the definition of "drive-by shooting" is vague and overly broad. He specifically refers to the terms "public", "cause harm", and "frighten" as being vague and overly broad.
The constitutional guarantee that an accused shall be informed of the nature and cause of the accusation against him requires that penal statutes describe unlawful conduct with sufficient particularity and clarity that ordinary persons of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto. U.S. Const. Amend. XIV, § 1; La. Const., Art. I, §§ 2,13; State v. Byrd, 96-2302 (La.3/13/98), 708 So.2d 401. In determining the meaning of a statute and hence its constitutionality, penal statutes must be "given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." La. R.S. 14:3. State v. Azar, 539 So.2d 1222, 1225 (La.1989), cert. denied, Azar v. Louisiana, 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989). A statute is unconstitutionally vague if an ordinary person of reasonable intelligence is not capable of discerning its meaning and conforming his conduct to it. In addition, a penal statute must provide adequate standards by which the guilt or innocence of the accused can be determined. State v. Greco, 583 So.2d 825 (La. 1991).
The terms of which defendant complains are not vague and/or ambiguous. A person of reasonable intelligence can easily discern the meanings of "public", "cause harm", and "frighten", apply them to context of the statute and conform their conduct thereto. These terms proscribe conduct in which a person, riding in a vehicle on street or highway which is open for common use, opens fire upon another person with the intent to kill or cause injury or fear to the other person. Thus, the statute is not unconstitutionally vague.
The defendant also suggests that the statute is overly broad. Individuals are protected from incursions by the state into certain areas of their lives by the Fourteenth Amendment of the United States Constitution, and a statute would be overbroad and, thus, constitutionally defective, if it extends state criminal authority beyond the proper reach of government into one of these protected areas. In order for the principle of overbreadth to apply, a constitutionally protected right must be claimed in the prosecution. State v. Griffin, 495 So.2d 1306 (La. 1986). Overbreadth invalidation of statutes is generally inappropriate when the allegedly impermissible applications of the challenged statute affect conduct rather than speech. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); State v. Neal. 500 So.2d 374 (La.1987). A person to whom a statute may constitutionally be applied does not have standing to question the constitutionality of the statute on over breath issues. Broadrick v. Oklahoma; State v. Griffin.
In the present case, the defendant's alleged criminal actions fit squarely within the proscribed conduct of the statute. Thus, the defendant does not have standing to *563 question the constitutionality of the statute on the over breath issue.
The defendant further asserted in his motion to quash that the evidence was insufficient to support the allegation of specific intent to kill more than one person. A motion to quash is essentially a mechanism by which to raise pretrial pleas of defense, i.e., those matters which do not go to the merits of the charge. La.C.Cr.P. articles 531-534. "In considering a motion to quash, a court must accept as true the facts contained in the bill of information and in the bill of particulars, and determine as a matter of law and from the face of the pleadings, whether or not a crime has been charged." State v. Byrd, 96-2302, p. 18, 708 So.2d at 411. The question of factual guilt or innocence of the offense charged is not raised by a motion to quash. State v. Robertson, 615 So.2d 1036 (La.App. 1st Cir.1993), writ denied, 619 So.2d 1062 (La.1993). In the case at bar, the defendant alleges that the state does not have sufficient evidence to support its allegation that the defendant had the specific intent to kill more than one person. As this issue goes to the merits of the charge, it was improperly raised in the defendant's motion to quash. The trial court correctly denied the defendant's motion to quash.
As defendant's assignment is without merit, there are no errors patent.

B. Assignment of Error No.2

The defendant argues that the prosecutor's comments and behavior were improper and prejudicial. The defendant, in his appellate brief, refers to several instances during trial when the prosecutor's actions and comments were allegedly improper. The defendant cites to one instance during the state's opening argument in which the prosecutor referred to other crimes allegedly committed by the defendant. A review of the state's opening statement reveals that the state did not refer to any other crimes. The defendant also contends that the prosecutor impermissibly obtained testimony from a another assistant district attorney concerning the verdict in Henry Talley's trial. A review of the trial transcript reveals that the prosecutor, Mr. Woods, asked Roger Jordan if he knew the outcome of the Talley trial. The defendant objected to the question, and the trial court sustained the objection. However, Mr. Roger Jordan responded to the question. At that point, the defendant did not seek an admonition or mistrial from the trial court. As the defendant did not request an admonition or mistrial, he cannot complain of the alleged error on appeal. La.C.Cr.P. article 841; State v. Chambers, 95-0898 (La.App. 4th Cir.12/28/95), 666 So.2d 716, writ denied, 96-1699 (La.7/30/97), 697 So.2d 593.
The defendant also alleges that Mr. Woods went beyond the scope of evidence during his rebuttal closing argument. The defendant argues that Mr. Woods improperly referred to the fact that the defendant would be testifying in a future trial against the person who shot him. Under La.C.Cr.P. art. 774, the argument of both prosecution and defense "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case ... The argument shall not appeal to prejudice." Because of this statutory provision, a prosecutor in Louisiana is prohibited from intentionally referring to, or arguing on the basis of, facts outside the record, whether at trial or on appeal, unless such facts are matters of common knowledge based on ordinary human experience or matters of which courts may take judicial notice. State v. Kaufman, 304 So.2d 300 (La.1974), appeal after remand, 331 So.2d 16, cert. denied, Kaufman v. Louisiana, 429 U.S. 981, 97 S.Ct. 495, 50 L.Ed.2d 591 (1976).
A review of the trial transcript reveals that the state's argument did not go outside the evidence. The state produced evidence that the defendant had been shot at least three times prior to the shooting which culminated in Wendell McGuffey's death. The police officers involved in the investigation of these shootings testified that the defendant identified Terence King as one of the perpetrators and that King had been arrested and charged in one of the shootings. Thus, the defendant's argument is without merit.
*564 The defendant further argues that Mr. Woods' behavior during trial was improper and prejudicial. The defendant refers to several instances where Mr. Woods incorrectly pronounced defense counsel's name. Defendant also complains that Mr. Woods' comments to the other assistant district attorney were loud enough to be heard by the jury. The defendant also alleges that Mr. Woods was improperly and flamboyantly showed his disapproval whenever the trial court ruled against the state.
When prejudicial conduct inside or outside the courtroom makes it impossible for a defendant to obtain a fair trial, a mistrial shall be granted upon his motion. La. C.Cr.P. article 775. The determination as to whether that provision controls is within the sound discretion of the trial judge, however, and the denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. State v. Gipson, 28,113 (La.App. 2nd Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402. Mistrial should only be ordered where the defendant has suffered prejudice so substantial as to deprive him of any reasonable expectation of a fair trial. Id.
The trial record supports most of the defendant's allegations. During trial, defense counsel noted these instances to the trial judge who then reprimaded the prosecutor. Thus, it appears that the trial court sustained the defendant's objections and ordered the prosecutor to discontinue such behavior. However, at no time did the defendant ever seek an admonition or mistrial based upon the prosecutor's conduct. As the defendant did not request an admonition or mistrial, he cannot complain of the alleged error on appeal. La.C.Cr.P. article 841; State v. Chambers.
This assignment is without merit.

C. Assignment of Error No.3

In this assignment, the defendant contends the trial court erred when it did not order Henry Talley to take the witness stand and claim his privilege against self-incrimination in front of the jury.
The United States Constitution and the Louisiana Constitution of 1974 provide a privilege against self-incrimination. U.S. Const., Amend. V; LSA-Const. of 1974 Art. 1 Sec. 16. A witness may assert the privilege when he has reasonable cause to apprehend danger from a direct answer. Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951). Normally, a witness, as opposed to the defendant on trial, may assert the privilege only on a question-by-question basis. State v. Wilson, 394 So.2d 254 (La.1981); State v. Savoy, 537 So.2d 246 (La.App. 4th Cir.1988). However, a witness is permitted to assert a blanket privilege, despite the compelling interest of the accused to present a defense, when it is evident that the answer to questions, or answers to explain the refusal to answer any questions posed, could result in injurious disclosure. State v. Coleman, 406 So.2d 563 (La.1981); State v. Roebuck, 532 So.2d 812 (La.App. 4th Cir.1988). This exception is generally applied when the witness is a co-defendant, the charges arise from the same incident as gave rise to the charges against the defendant, and the defendant seeks to question the witness about the incident. State v. Jones, 559 So.2d 492 (La.App. 5th Cir.1990), writ denied, 566 So.2d 981 (La.1990).
This exception was extended by this court to include a former co-defendant whose case was nolle prosequied prior to the defendant's trial and was therefore not a co-defendant during the defendant's trial. State v. Adams, 537 So.2d 1262 (La.App. 4th Cir. 1989), reversed on other grounds, 550 So.2d 595 (La.1989). In that case, this court reasoned that there was no difference in the exposure of a witness who had been charged and one whose charges had been nolle prosequied because the State could always reinstitute the charges against the witness. The blanket privilege has also been approved for a witness already convicted and sentenced but who might be exposed to further criminal liability by answering the questions. Coleman; State v. Seaton, 604 So.2d 182 (La. App. 4th Cir.1992).
Further, the Supreme Court has held that it is improper conduct for either the *565 prosecution or the defense to knowingly call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim or privilege. State v. Berry, 324 So.2d 822 (La.1975), cert. denied, Berry v. Louisiana, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976).
Although Talley had been convicted and sentenced for his participation in the murder of Wendell McGuffey, his conviction was not final as the appeal of his conviction was still pending at the time of trial. Thus, Talley could be exposed to further criminal liability depending upon the outcome of his appeal. Further, defendant sought to have Talley testify about the night of the murder. He sought to question Talley about his whereabouts and involvement with Gerald Williams. The trial court did not err in allowing Talley to take a blanket Fifth Amendment privilege. The trial court also did not err when it refused the defendant's request that Talley take the stand in front of the jury to assert his privilege.
The defendant also argues that he was deprived of his rights under the Compulsory Process Clause of Sixth Amendment when the trial court refused allow Talley to take the witness stand to assert his privilege. The United States Fifth Circuit Court of Appeal has held that the Compulsory Process Clause provides no such rights with respect to a witness claiming a valid privilege. United States v. Griffin, 66 F.3d 68 (5th Cir.1995). As Talley had the right to assert his Fifth Amendment privilege, the Compulsory Process Clause did not provide defendant with a right to force Talley to take the witness stand to assert his right against self-incrimination.
This assignment is without merit.

D. Assignment of Error No.4

The defendant also objects to the failure of the trial court to charge the jury on the legal presumption concerning a party's obligation to produce witnesses in support of their case. The defendant also suggests that the trial court's jury instructions on transferred intent, first degree murder, second degree murder and manslaughter were improper.
Under La.C.Cr.P. article 803, the trial judge is required to charge the jury as to the law applicable to the case. State v. Toomer, 395 So.2d 1320 (La.1981). Special requested charges, if wholly pertinent and correct, shall be given provided they require no qualification, limitation or explanation. La.C.Cr.P. article 807. Any such charge must be supported by the evidence, as the trial judge is not required to instruct the jury on abstract principles of law. Id. The trial court's refusal to give a requested special charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the defendant. La.C.Cr.P. article 921; State v. Vergo, 594 So.2d 1360 (La.App. 2nd Cir. 1992), writ denied, 598 So.2d 373 (La.1992).
A jury charge must be considered as a whole, and particular expressions in a charge must be construed in context with the entire charge. A conviction will not be reversed on the ground of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied, Motton v. Louisiana, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981).
The defendant sought a jury instruction concerning the legal presumption established in La. R.S. 15:432 which concerns the admission of evidence under the control of a party.[2] The statute provides, in pertinent part, that "[a] legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; such is the presumption attaching to the regularity of judicial proceedings; ... that evidence under the control of a party and not produced by *566 him was not produced because it would not have aided him." The defendant argued for this instruction contending that Lavar Rickmon was under the control of the state and the jury should be instructed that the failure of the state to call Rickmon should be construed against the state. A review of the record reveals that the state sought to call Rickmon as a witness but it could not locate him. Rickmon had been incarcerated at the time of Henry Talley's trial and testified at Talley's trial. However, Rickmon had been released from prison after Talley's trial, and the state could not locate him. The state sought to have Rickmon declared an unavailable witness and introduce Rickmon's prior testimony at the defendant's trial. The trial court denied the state's motion. The defendant refused to stipulate to portions of Rickmon's testimony.
There is no evidence to suggest that Rickmon was under the control of the state at the time of the defendant's trial. While Rickmon had been incarcerated at the time of Talley's trial, he had subsequently been released from prison. At the defendant's trial, the assistant district attorneys acknowledged they were unable to locate Rickmon. The trial court correctly denied defendant's proposed jury instruction on La. R.S. 15:432.
The defendant also objected to the trial court's instructions on transferred intent, first degree murder, second degree murder and manslaughter. He argued that the instructions were confusing and erroneous. After a review of the transcript we find the judge did not err in his instructions to the jury.
The trial court's jury instructions defining the possible verdicts were not erroneous as the instructions followed the definitions of the offenses provided in the statutes. La. R.S. 14:30 defines first degree murder as the killing of a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of... drive-by shooting ... [or] ... [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon more than on person." Second degree murder is defined as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm; or ... [w]hen the offender is engaged in the perpetration or attempted perpetration of ... drive-by shooting ... even though he has no intent to kill or to inflict great bodily harm." La. R.S. 14:30.1. "Drive-by shooting" is defined as "the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person." La. R.S. 14:37.1.
La. R.S. 14:31(A)(1) provides that manslaughter is "[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in a sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." The statute further defines manslaughter as "[a] homicide committed, without any intent to cause death or great bodily harm ... [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1., or of any intentional misdemeanor directly affecting the person." In the present case, the state has asserted that the defendant was engaged in either the illegal use of weapons or aggravated assault. Aggravated assault is "an assault committed with a dangerous weapon." La. R.S. 14:37. Illegal use of weapons is defined as "the intentional or criminally negligent discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable that it may result in death or great bodily harm to a human being. La. R.S. 14:94.
Further, the trial court's charge concerning transferred intent was not erroneous or confusing. The trial court's instruction simply explained the basic principle upon which the theory of transferred intent is based. The court stated that "[w]hen a person commits an act, having a specific intent to kill or inflict great bodily harm upon a certain person by the act, but instead kills another person by mistake or inadvertence, the law nonetheless holds him responsible for the death of that other person, and further holds that it is just as if the person had *567 originally intended to kill or inflict great bodily harm upon the person actually killed."
In State v. Jasper, 28,187 (La.App. 2nd Cir.6/26/96), 677 So.2d 553, writ denied, 96-1897 (La.2/21/97), 688 So.2d 521, a similar instruction was upheld as correct. The court in Jasper instructed the jury that "[w]hen a person shoots at one person with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing of inflicting of great bodily harm would have been unlawful against the first person, then it would be unlawful against the person actually shot, even though that person was not the intended victim."
The instruction given in the present case correctly stated the theory of transferred intent and did not require further explanation. See State v. Cannon, 26,906 (La.App. 2nd Cir.6/21/95), 658 So.2d 728.
This assignment is without merit.

E. Assignment of Error No.5

The defendant argues in his last assignment that the state failed to produce sufficient evidence to support his conviction for first degree murder.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The defendant was charged with and convicted of first degree murder in violation of La. R.S. 14:30(A)(1),(3). The statute, in pertinent part, defines first degree murder as "the killing of a human being ... [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... drive-by shooting ... [or] ... [w]hen the offender has the specific intent to kill or to inflict great bodily harm upon more than on person." "Drive-by shooting" is defined as "the discharge of a firearm from a motor vehicle on a public street or highway with the intent either to kill, cause harm to, or frighten another person." La. R.S. 14:37.1. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10. Specific intent need not be proven as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982).
The testimony of Gerald Williams and Dennis Roussell was sufficient to meet the state's burden of proving defendant's guilt beyond a reasonable doubt. The testimony of these two witnesses reveals that the defendant shot the victim during a drive-by shooting. The evidence indicates that the defendant was looking for Dennis Roussell and intended to shoot him. Testimony from several police officers reveals that the defendant had previously identified Roussell as a possible suspect in at least one of the shootings in which the defendant was injured. Thus, the state proved that the defendant shot the victim during a drive-by shooting and had the specific intent to kill or inflict great bodily harm on Roussell. While the victim was not the intended target, under the theory of transferred intent, the defendant's *568 specific intent to kill or inflict great bodily harm was transferred to the victim.
Further, the evidence also supports the defendant's conviction under portion of the first degree murder statute which defines first degree murder as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm upon more than one person. The evidence shows that the victim was killed when the defendant intentionally fired a weapon in an area where a number of children were playing. In State v. Tyler, 342 So.2d 574 (La.1977), cert. denied, Tyler v. Louisiana, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977), the defendant was convicted of first degree murder by firing a gun into a crowd. The Supreme Court noted that the jurisprudence supported the proposition that shooting into a crowd indiscriminately with intent to kill someone was an assault with intent to kill each of them. See also State v. Kennington, 515 So.2d 521 (La.App. 1st Cir.1987); State v. Hall, 606 So.2d 972 (La.App. 3rd Cir.1992), writ denied, 93-0051 (La.11/11/94), 644 So.2d 385; State v. Guillory, 95-383 (La.App. 3rd Cir.1/31/96), 670 So.2d 301.
This assignment is without merit.
Accordingly, we affirm the defendant's conviction and sentence.
AFFIRMED.
PLOTKIN, Judge, concurring.
I agree with the majority resolution affirming the defendant's conviction and sentence. I write separately to address the prosecutorial and professional misconduct that occurred throughout the course of this trial.
The majority correctly notes that defendant's allegations of prosecutorial misconduct are supported by the record. Throughout the trial, the prosecutor mispronounced defendant's counsel's name and when corrected, made remarks inappropriate to courtroom decorum. While I cannot enter the mind of the prosecutor and engage in an examination of why he continuously did this, I can only speculate that he was attempting to distract the jury and ridicule the defendant his counsel. This type of incivility violates the Code of Professionalism in the Courts. See Louisiana Rules of Court, Supreme Court Rules, Part G, § 11 (West 1998). Furthermore, the prosecutor incessantly commented and gesticulated during defense counsel's questioning of witnesses. His comments to fellow co-counsel were often spoken loudly enough for the court to hear, therefore, there is a strong likelihood that the jury could also hear these comments regarding the state's interpretation of the evidence and the witnesses. This was highly improper because of the risk of tainting the jury's formative opinion of the evidence and the witnesses by the use of extrajudicial comments. Although the prosecutor was warned about his behavior on more than one occasion, his conduct persisted.
As noted in the majority opinion, the standard of review regarding prosecutorial misconduct is whether the prosecutor's comments and actions rendered the trial fundamentally unfair and the resulting conviction a denial of due process. In this particular case, there was overwhelming evidence against the defendant. As such, I cannot say that actions of the prosecutor substantially prejudiced the defendant in this case. But, in another case without the same level of compelling evidence against the defendant, similar actions by the prosecutor would likely result in a reversal of conviction.
NOTES
[1] Henry Talley was convicted of second degree murder on January 29, 1997, and sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Gerald Williams pled guilty to manslaughter on November 22, 1996, and was sentenced to ten years at hard labor on May 9, 1997. Williams entered into a plea agreement with the State that he would testify at Talley's and Jordan's trials. Williams was sentenced after he testified at both trials.
[2] The defendant allegedly included a jury instruction on the legal presumption in the requested jury charges presented to the trial court. The jury instruction was designated as proposed jury instruction number five. This proposed jury charge is not in the record. However, a review of the trial transcript indicates that the proposed jury charge was a verbatim reading of the statute.