805 So.2d 292 (2001)
STATE of Louisiana
v.
Robin B. BUNLEY.
No. 2000-KA-0405.
Court of Appeal of Louisiana, Fourth Circuit.
December 12, 2001.
*295 Harry F. Connick, District Attorney, Anne M. Dickerson, Assistant District Attorney, *296 New Orleans, LA, Counsel for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, LA, Counsel for Defendant/Appellant.
Court composed of Judge CHARLES R. JONES, Judge TERRI F. LOVE and Judge MAX N. TOBIAS, Jr.
TOBIAS, Judge.
On 27 March 1997, the State indicted Robin B. Bunley ("Bunley" or "the defendant") and Ricky Coston ("Coston")[1] for the first-degree murder of Lillian G. Thomas ("Thomas"). Bunley pled not guilty at her arraignment on 1 April 1997. Jury selection commenced 13 July 1998, but a mistrial was ordered on 23 June 1998.[2] A second trial commenced 14 July 1998, and on 18 July 1998, the jury found the defendant guilty of second-degree murder. On 21 August 1998, the defense filed motions for post verdict judgment of acquittal and new trial, which were denied. On that same day, the court sentenced the defendant to life imprisonment without benefit of parole, probation, or suspension of sentence. A timely motion for appeal followed.

STATEMENT OF FACT
On 22 January 1997, Simuel Miller, III ("Miller") filed a missing persons report on the victim, Thomas, his godmother. Officer John Dobard responded to the report and met with Miller at Thomas' residence. Miller explained to Officer Dobard that the last contact he had with Thomas was on 5 January 1997. He gave Officer Dobard three cancelled checks drawn on Thomas' Hibernia National Bank checking account. One of the checks, dated 29 December 1996, was made payable to Schwegmann's Supermarket. The other two checks, made out to "cash" in amounts totaling $925.00, were written and cashed after 5 January 1997, the last date Miller had contact with Thomas. Miller told Officer Dobard that the signatures on the three checks did not belong to Thomas.
When the missing person report crossed Detective Ronald Brink's desk the following day, he began investigating the matter, and contacted some of the victim's family members. Detective Brink also contacted Hibernia National Bank's fraud investigator, Ado Ball, and learned that on 30 December 1996, the victim executed an affidavit attesting that her purse had been stolen, and that checks were subsequently improperly cashed against her account. Bank records indicated a rapid depletion of funds from the victim's checking and savings accounts during the time she had been reported missing.
On 25 January 1997, Detective Brink and Miller sorted through Thomas' mail at her residence, and discovered an envelope addressed to the victim, which contained a contract of lease for a house at 4737 Loyola Avenue. The contract named Thomas as lessor of the property and Bunley as tenant. Detectives Joseph Waguespack and Brink went to Bunley's house at approximately 10:00 p.m. that night to speak with her. Bunley stated that she and her three children had lived at the address since November 1996. She said the last time she saw Thomas was 6 January 1997 at around 2:00 p.m., when Thomas came to pick up the balance of the defendant's security deposit on the house. The defendant *297 stated that she received a $76.00 monthly subsidy from the Housing Authority and that her only source of income came from doing "hair plaits." She added that her friend, NOPD Officer Wheeler Sullivan ("Sullivan"), helped her out from time to time and that in fact the $225.00 she paid the victim on 6 January 1997 had come from Sullivan.
Detective Brink continued to interview the victim's family and neighbors and on 27 January 1997, issued a public appeal via local television stations for help in locating the victim. That same day, Officer Ralph Caesar responded to a complaint of an abandoned car in the 4400 block of Dryades Street. Officer Caesar ran the car's license plate and learned that the vehicle had been reported missing by Detective Brink in his missing person's investigation. Ellis Joubert, whose business office was located in the 4400 block of Dryades Street, told Detective John Ronquillo that the victim's vehicle had been parked there since shortly after the first of the year, vandalized, and collecting dust and debris. Later that same evening, Sullivan called the Sixth District police station to report that he had information on the victim. Officer James Daughtry met with Sullivan, who confided that he had just seen the news broadcast about Thomas and feared he might be implicated in her disappearance.
At trial Sullivan testified that he and Bunley had been lovers for about ten years, and that he gave her money periodically. When he tried to break off the affair, the defendant threatened him with the exposure of the relationship to his wife, family, and the NOPD. This intimidation kept him under the defendant's control. He told Officer Daughtry that Bunley called him early in January 1997, and told him that Thomas had had a heart attack and died at the defendant's residence, but that he ignored the defendant. Thereafter, in mid-January, Bunley called and asked Sullivan to visit her at the 4737 Loyola Avenue residence, which he did. After the pair engaged in sex, the defendant took Sullivan into the back room where she showed him a blanket-covered object on the floor. Sullivan believed the object was Thomas' body. He refused to discuss what he had seen with the defendant and told her that he did not want to get involved. After divulging this information, Sullivan was arrested and charged as an accessory after the fact of murder for failure to report the crime in a timely manner.[3]
Acting upon information supplied by Sullivan, Detective Ronquillo obtained and executed a search warrant at Bunley's residence in the early morning hours of 28 January 1997, in the hope of finding the victim's body. The search did not produce the body.[4] Thereafter, Bunley accompanied the officers to the homicide division, where she was interviewed concerning her knowledge of Thomas' disappearance. At approximately 5:00 a.m. on 28 January 1997, Bunley led officers to the rear of a building in the 4600 block of South Claiborne Avenue, where they found the victim's smoldering remains.
The defendant gave two videotaped statements, which were viewed by the jury.
In her first videotaped statement recorded on 28 January 1997, Bunley said *298 she first met the victim when she rented the Loyola Avenue property from her. Bunley moved into the house in October 1996; about a month later, a friend introduced her to Coston, a drug dealer. The defendant admitted using marijuana and cocaine with Coston in her home and "the spot," the place where Thomas' charred remains were recovered. She said that she last saw the victim on 20 January 1997. She described coming home that day and finding Coston sitting on the steps in the back of her house. He was distraught over having allegedly killed "a lil' youngster" in the St. Thomas Housing Development. When she and Coston entered the house, she discovered Thomas dead on the floor between the kitchen and bedroom. She said she assumed the victim died from a heart attack or stroke because there was nothing to suggest foul play. The defendant wanted to notify the authorities; however, Coston would not let her.[5] Instead, Coston covered the victim's body with a blanket and put it in the trunk of his car,[6] telling the defendant he would dispose of it. When the defendant spoke to Coston on 27 January 1997, he told her that he would take the body to "the spot" and burn it. Bunley claimed she called Sullivan and told him of the victim's death, giving him the impression the body was still in her house. Sullivan told her to call the police, and then went to the defendant's house, where he allegedly told her he would have helped her move the body earlier; however, moving it now was too risky. The defendant said she called Crimestoppers and the Second District NOPD station, but could not get help from anyone. She said that she heard nothing about the victim from anyone, until the police came to her house one week later. Bunley said that Coston gave her the victim's checkbook and savings withdrawal slips, telling her to forge Thomas' signature. The defendant denied cashing checks or withdrawing funds from Thomas' accounts.
After the police interviewed Coston and Sullivan, they re-interviewed Bunley. She told Detectives Dwight Deal and Kenneth Harris that she had not been completely truthful in her earlier statement, that she lied to protect herself. She recanted her earlier statement that Thomas died of natural causes, and admitted to participating with Coston in the "set-up" which led to the victim's death. Bunley directed and accompanied officers to an alleyway off South Telemachus Street, where she said the victim's body had been dumped before being re-located to "the spot" and burned. The defendant returned to the homicide office and agreed to give Detectives Deal and Harris a second videotaped statement.
The second statement was videotaped on 30 January 1997 by Detectives Deal and Harris. In this statement, Bunley said she told Coston on 4 January 1997 that the victim would be at her rented house on 6 January 1997 to collect the security deposit on the house. Coston told the defendant he was going "to get" the victim and asked if the defendant agreed with that. On 6 January 1997, when the victim arrived to collect the deposit, Coston watched from down the block, seated in his car. Coston had planned to cause a car accident, and then rob the victim. When Coston returned to the defendant's house an hour later and gave her $75.00, she knew where the money had come from. The defendant noticed the victim's car parked on Valence *299 Street two days later, but did nothing. On 9 January 1997, Coston gave Bunley the victim's checkbook, and told her to forge the signature and post date the checks because he was going to "swing the checks." Bunley complied and gave Coston all of the forged checks, denying that she cashed any. She recounted accurately the types and numbers of items processed against the victim's accounts, and estimated that $7,000 was stolen. However, she said she received only $900 from Coston, which she used to buy furniture. The defendant claimed that she saw Thomas' body in the trunk of Coston's car on 20 January 1997. She said she observed ligature marks on the victim's wrists, and that the victim's face was completely covered with adhesive residue, which appeared to have been left by the removal of duct tape. The defendant said she thought the tape smothered the victim. The next day, Coston wrapped the body in a blanket and placed it Bunley's back room. The defendant did not call the police; instead she called Sullivan, who promised he would get rid of the body for her. Sullivan never did so. On 23 January 1997, she and Coston placed the body into the truck of Coston's car and drove to the Telemachus Street location, where Coston dumped the body. Coston threatened the defendant's life and her children's lives if she turned him in. Four days later, on the day the victim's disappearance was telecast, Bunley accompanied Coston to re-locate the victim's remains. He placed the body in a plastic bag and transported it to "the spot" on South Claiborne Avenue. The defendant claimed she told Sullivan of the location of the victim's body and allowed Sullivan to borrow a gas can. The defendant claimed everything she did was done out of fear of Coston.
Dr. William Newman, an expert in forensic pathology, performed an autopsy on the body of the seventy-seven year old Thomas and concluded she did not die of natural causes. From internal and external examination of the organs, Dr. Newman ruled out heart attack and stroke as causes of death. He determined that the victim did not burn to death, but died of suffocation, consistent with her nose and mouth being blocked by duct tape.
The evidence marshaled, tested, and introduced by the State at the trial in this case included clothing worn by Bunley and Coston at the time of their arrests; reference samples of hair, clothing, material swatches, and fibers collected from the victim's body at the time of autopsy; soil samples from the South Telemachus Street and South Claiborne Avenue sites; and a length of duct tape found at the South Telemachus Street site. Documentary evidence in this case included checks and withdrawal slips processed against Thomas' bank accounts and handwriting exemplars and fingerprints taken from Bunley, Coston, and Sullivan.
Criminalist Joseph Tafaro, who testified by stipulation as an expert in forensic microscopy, stated that soil samples from the area where the victim's charred remains were discovered, as well as samples of the blanket in which the victim's body was wrapped, tested positive for the presence of an accelerant, gasoline. The clothes the defendant was wearing at the time of her arrest on 28 January 1997 and clothing retrieved from the defendant's residence contained fibers identical to those from the blanket that covered the victim's body and the skirt found on the victim's remains. Fibers vacuumed from Bunley's house contained fibers from the blanket and the victim's clothing.
Duct tape retrieved from the South Telemachus Street site contained the victim's hair and fibers from her clothing, plus a fiber from Bunley's clothing. Post-mortern *300 banding on the hair on the duct tape indicated that at the time the hair was pulled out, the victim had been dead for one week.
Officer Glen Burmaster, an expert in fingerprint examination and analysis, testified that he examined bank checks and savings withdrawal slips presented for payment from Thomas' accounts during the period that she was reported missing. He found a thumb fingerprint on one of the checks, and compared it to the known fingerprints of Bunley, Coston, and Sullivan. He identified the print as belonging to Bunley.
James Dupuis, a handwriting analysis expert, examined sixteen checks and/or withdrawal slips presented for payment on the victim's account during the period she was reported missing. Dupuis compared the signatures on the documents with the handwriting exemplars provided by Bunley, Coston, and Sullivan, and determined that Bunley had forged the signatures on the checks and withdrawal slips. She authored twelve of the sixteen items, and it was "probable" that two more were her authorship. No matches existed as to Coston or Sullivan.
Hibernia National Bank service representative Melissa Plaisance established that on 30 December 1996, she had assisted Thomas in opening a new checking account pursuant to the victim's complaints of irregularities with her prior account. As proof of identity, Thomas produced her driver's license, which bore an issue date of 2 December 1996.
Hibernia National Bank tellers Christina Pratts, Richelle Giardina, and Tonya McClairon testified that when the forged checks and/or savings withdrawal slips were presented for payment against the victim's account at their respective drive-up windows, Thomas' 2 December 1996 driver's license was presented as identification. Although none of the tellers could identify Bunley as the person who presented the forged items for payment, Ms. Pratts recalled an occasion on which a passenger in a red compact car came through her St. Charles Avenue branch drive-up lane and presented a withdrawal slip written on the victim's account. Ms. Pratts remembered the incident because the account had been flagged, and she was unable to obtain authorization to release the funds; thus the transaction was not completed. On 27 January 1997, Ms. Pratts viewed the televised report of Thomas' disappearance, and recalled the aborted transaction from a week before.
Darren Paul testified that he and Bunley were friends. In January 1997, he was driving a red Toyota Corolla automobile, and in fact, drove the defendant to various Hibernia National Bank locations to cash checks. He recalled driving the defendant to the St. Charles Avenue branch of the Hibernia Bank in a red car and to Kirschman's furniture store.
Thelma Batieste, a Kirschman's representative, verified through store records that on 15 January 1997, the defendant purchased $965.72 in furnishings, paying $800.00 in cash, with the balance due upon delivery. The defendant's name and 4737 Loyola Avenue address appear on the receipt.
Carl Cook of Campo Electronics assisted the defendant on 13 January 1997, when she purchased a range and other appliances totaling $675.20, for which she paid cash. The name and address on the receipt of the purchaser delivery was "Beatrice Bunleu" at 4737 Loyola Avenue.

ERRORS PATENT
Bunley assigns two errors patent as to her sentencing. First, she complains that the trial court failed to advise her of the prescriptive period for filing applications *301 for post-conviction relief under La. C.Cr.P. art. 930.8. This article contains precatory language and does not bestow an enforceable right upon an individual defendant. State v. Handy, XXXX-XXXX (La.App. 4 Cir. 1/24/01), 779 So.2d 103, citing State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95), 660 So.2d 1189, 1201. We note and do hereby inform the defendant that La.C.Cr.P. art. 930.8 generally requires that applications for post-conviction relief be filed within two years of the finality of a conviction.
The second error patent cited by the defendant is that the trial court failed to give her credit for time served when it imposed the sentence. Neither the sentencing transcript nor the commitment indicates that the trial court granted her such credit. In 1997 the legislature amended La.C.Cr.P. art. 880 to provide that a defendant "shall receive" credit toward service of his or her sentence for time spent in actual custody. Accordingly, a defendant now receives credit for time served by operation of law; the sentencing court need not order it. State v. Bazile, 99-1821 (La.App. 4 Cir. 3/29/00), 757 So.2d 851, writ den. XXXX-XXXX (La.3/16/01), 782 So.2d 574.
Considering the above, no errors patent are present.

ASSIGNMENT OF ERROR NUMBER 1
Bunley argues that the trial court erred in denying her motion for mistrial predicated on the State's introduction of "other crimes" evidence. She claims that in its opening statement the State implied that she forged checks on the victim's account. The defendant reasons that because she was not indicted on forgery charges, the prosecution's remark was a prejudicial reference to a crime for which she had not been charged.
The portion of the State's opening remarks to which the defendant objects reads:
The bottom line is Robin Bunley stands on trial before you now, and that's what you have to focus in on, the evidence that the State presents against Robin Bunley.... This scenario which the State is going to present to you involves complaints that Ms. Thomas filed with a bank, more particularly Hibernia Bank, on or about December 30th of 1996
La.C.Cr.P. art. 770 mandates a mistrial, upon motion of a defendant, "when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to: ... another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible."
The prosecution's remarks were not "direct or indirect" reference to other crimes committed by defendant. La. C.Cr.P. art. 770. At the side bar conference called in response to the defendant's objection, the prosecutor pointed out that he had not accused the defendant of any involvement with forged checks. He cited the victim's complaint of checking account irregularities as one reason her family initiated a missing person's complaint. As is evident from the portion of the disputed opening statement, the prosecutor did not disclose the nature of the victim's complaints to the bank, much less accuse the defendant of being the cause of the complaints. The prosecutor's explanation clarified that his remarks were made to develop the basis for the investigation into Thomas' disappearance. Nevertheless, even if the remark were a reference to other crimes, the statement was harmless error because the jury's verdict was surely *302 unattributable to that statement. The prosecutor's ambiguous statement was apparently not repeated when his opening statement resumed. Moreover, the foundation of the State's case was not this obscure portion of its opening statement, but rather the mass of documentary and physical evidence presented at trial. The trial judge did not err in denying the defendant's motion for mistrial.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2
In her second assignment of error, Bunley claims the trial court erred by allowing Dr. Newman to testify that the victim's death was a homicide, as that was "a question of ultimate fact to be determined by the jury."
Article 702 of the Louisiana Code of Evidence provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Additionally, Article 704 provides:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact. However, in a criminal case, an expert witness shall not express an opinion as to the guilt or innocence of the accused.
In this case, the defense stipulated to Dr. Newman's expertise in forensic pathology. Dr. Newman testified within the limits of his area of expertise, "the systematic examination both internally and externally" of the victim's body as documented in the autopsy protocol, that he prepared. Dr. Newman opined that the victim died of suffocation, basically a diagnosis of exclusion, i.e., neither heart, brain, major organ failure, nor strangulation or smoke inhalation related. The prosecution questioned Dr. Newman whether "within the boundaries of reasonable medical certainty, would [the victim's] death be classified as a natural death or as a homicide," to which he responded "homicide." Dr. Newman was not rendering an opinion as to Bunley's guilt or innocence, only that the victim did not die of natural causes. As further questioning under cross-examination indicates, Dr. Newman rendered a medical opinion as to the cause of death, admitting that he had no idea who was responsible for the victim's death.
This assignment is meritless.

ASSIGNMENT OF ERROR NUMBER 3
Bunley submits in her third assignment of error that the district court gave conflicting jury instructions regarding the law of principals and specific intent. Particularly, the defendant notes that the court's initial charge properly instructed the jurors as to a principal's requisite specific intent to kill or inflict great bodily harm. However, after having begun deliberating, the jury requested re-instruction with regard to responsive verdicts. The defendant maintains that at that time when the judge instructed the jury on the law of second-degree murder, he failed to include the instruction on specific intent regarding principals, thereby confusing the jury.
When considering an allegedly improper jury instruction, a reviewing court must determine whether it is "reasonably likely" that the jury applied the challenged instruction in an unconstitutional manner, not whether it is possible that the jury misapplied the instruction. In determining whether it is reasonably likely that the jurors misapplied the instruction, *303 the challenged terms are considered in relation to the instructions as a whole. State v. Lennon, 95-0402 (La.App. 4 Cir. 9/15/95), 661 So.2d at 1049, citing Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 1241, 127 L.Ed.2d 583 (1994); State v. Smith, 91-0749 (La.5/23/94), 637 So.2d 398, 402, cert. den., 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 546 (1994). The test is whether, taking the instruction as a whole, reasonable persons of ordinary intelligence would understand the charge. State v. West, 568 So.2d 1019 (La.1990).
A conviction will not be reversed on the ground of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981); State v. Jordan, 97-1756 (La.App. 4 Cir. 9/16/98), 719 So.2d 556.
In this case, at the outset, the judge instructed the jury that they "must not single out any one of these instructions and disregard others. The order in which the instructions are given does not indicate that one instruction is more important than the other." The judge also told the jury "the defendant is charged with the first degree murder of [the victim]", and that "first degree murder is the killing of a human being when the offender has a specific intent to kill." Just prior to the preceding instruction, the judge advised the jury that in order to find the defendant a principal to first degree murder "you must find that the defendant had a specific intent to kill or inflict great bodily harm...." The judge went on to instruct the jury that second-degree murder is:
... the killing of a human being when the offender had a specific intent to kill or inflict great bodily harm. Second degree murder is also defined as the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of simple robbery even though she has no intent to kill or inflict great bodily harm; thus, in order to convict the defendant of second degree murder, you must find that the defendant killed [the victim] and that the defendant acted with a specific intent to kill or inflict great bodily harm, or in order to convict the defendant of second degree murder, you must find that the offender killed [the victim] while the offender was engaged in the perpetration or attempted perpetration of simple robbery even though there is no specific intent to kill or inflict great bodily harm.
Without exception, the court's instructions on the law of specific intent crimes, as applicable to this case, included specific intent as an element. Considering that the jury returned a verdict of guilty of second-degree murder, a lesser included offense having nothing to do with principals, it is probable that the jury did understand the element of specific intent but instead, to the defendant's advantage, found that Thomas' death resulted from the defendant's perpetration or attempted perpetration of simple robbery, in the absence of specific intent.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 4
In a fourth assignment of error, the defendant attacks the evidence as insufficient to support her conviction for second-degree murder. The defendant contends the State failed to prove that the victim was "killed."
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, *304 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution. If rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
In this case, the defendant was charged by grand jury indictment with the "first-degree murder of [the victim] where the victim was over the age of sixty-five and/or during the perpetration or attempted perpetration of second degree kidnapping and/or during the perpetration or attempted perpetration of simple robbery." However, the jury returned a verdict of guilty of second degree murder, which is defined as the "killing of a human being... [w]hen the offender has a specific intent to kill or to inflict great bodily harm or when the offender is engaged in perpetration or attempted perpetration of second degree kidnapping ... or simple robbery, even though he has no intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. Specific intent is defined as that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). See also State v. Hebert, XXXX-XXXX (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050; State v. Hall, 98-0667 (La.App. 4 Cir. 12/22/99), 750 So.2d 1105, writ denied, 777 So.2d 475 (La.12/15/00). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Ricard, 98-2278, 99-0424 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, writ denied, Richard v. State, XXXX-XXXX (La.12/8/00), 775 So.2d 1078.
In this case, the defendant's statements, her actions of forging and cashing stolen checks, her failure to act when she knew the victim was in danger and even after she knew the victim to be dead, as well as the testimony of other witnesses and the physical evidence, establish that the defendant had the specific intent to kill or inflict great bodily harm on Thomas.
The defendant admitted to plotting to "set up" the victim on 4 January 1997 by causing a car accident, during which the victim would be robbed. The defendant knew the victim's schedule and habits, unlike Coston and Sullivan, who the defendant admitted did not know the victim. Her admission that she relied on friends for money to provide necessities for herself and her children evidenced her dire financial straits. Hibernia National Bank employees and bank documents established that two days after the victim was last reported seen alive, the defendant was forging and cashing checks on the victim's accounts. Officer Burmaster testified that he found, to the exclusion of Coston and Sullivan, only the defendant's thumbprint on the checks.
Dr. Newman's testimony indicated his autopsy of the victim's body eliminated natural causes for death. The State established the victim's age (seventy-seven) at the time of death through her driver's license. The jury watched the defendant recant her testimony that she found the victim dead of unknown causes and admit that the victim smothered to death as a result of placement of duct tape over her nose and mouth.
*305 The clothes worn by the defendant at the time of arrest contained fibers from the victim's clothing, proving she had close contact with the victim. Other fiber evidence, "signaling" by the search canines and the testimony of Sullivan established that the victim's remains had been in the defendant's residence. The police recovered duct tape described by the defendant at the South Telemachus Street location. The duct tape contained fibers and hairs from both the defendant and the victim. The defendant led the authorities to the victim's smoldering remains on South Claiborne Avenue clad in the same clothing that had deposited the fiber evidence on the clothes the defendant was wearing at the time of her arrest. The defendant knew the victim's remains were burned with gasoline, which later forensic testing verified.
Considering the testimonial and physical evidence, the jury could have reasonably concluded that the defendant had the specific intent to kill or inflict great bodily harm on the victim, or that the victim's death occurred during the perpetration or attempted perpetration of second degree kidnapping or simple robbery, even though the defendant had no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 5
In her fifth assignment of error, the defendant claims that the trial court erred in admitting photographs of the victim's remains at trial.[7] She argues that the exhibits were inflammatory and prejudicial.
The State introduced twelve photographs taken of the victim's remains shortly after they were recovered. Dr. Newman identified the photos as having been taken in the morgue and that they depicted extensive burning and charring to the victim's face, scalp, neck, anterior chest, and extremities.
The admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. State v. Sholes, 99-2414 (La.App. 4 Cir. 3/7/01), 782 So.2d 691, citing State v. Bourque, 622 So.2d 198 (La.1993), appeal after remand, 96-0842 (La.7/1/97) 699 So.2d 1, cert. denied, Bourque v. Louisiana, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998), overruled on other grounds, State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16; State v. Eaton, 524 So.2d 1194 (La.1988). No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543 (La.1986). The mere fact that a photograph is gruesome does not, in and of itself, render the photograph inadmissible. State v. Comeaux, 514 So.2d 84 (La.1987).
Post-mortem photographs at the scene and autopsy photographs of a murder victim are admissible to prove corpus delicti, to provide positive identification of the victim, and to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of *306 wounds. Id. citing State v. Bourque, 622 So.2d at 236.
The defendant in this case does not demonstrate why the photographs are prejudicial and inflammatory, but cites State v. Morris, 245 La. 175, 157 So.2d 728 (1963) as authority for her position.
In Morris the court found prejudicial and inflammatory photographs that were taken during an autopsy in which internal organs and viscera were depicted protruding from the autopsy incision. Although the photographs in this case are graphic, they are unlike those in Morris, in that they were taken before, not during, the autopsy. No incisions are apparent or body contents displayed in the photographs. They show the charred condition of the victim's remains shortly after discovery. Dr. Newman used the pictures to explain his conclusion that suffocation, not burning, was the cause of death. The defendant has not shown that these photographs were unduly prejudicial.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 6
In a sixth assignment of error, the defendant argues her sentence is excessive.
A review of the sentencing transcript does not indicate that defense counsel objected to the sentence. No motion for reconsideration of sentence is in the record. La.C.Cr.P. art. 881.1(D) provides that the failure to file a motion for reconsideration of sentence precludes the defendant from raising any claims about her sentence on appeal. See also State v. Weaver, 99-2376 (La.App. 4 Cir. 9/27/00), 770 So.2d 831.
Thus, this assignment of error has not been preserved for review.

ASSIGNMENT OF ERROR NUMBER 7
In a final assignment of error, the defendant contends she received ineffective assistance of counsel if her excessive sentence claim was not preserved for appellate review because of counsel's failure to file a motion for reconsideration of sentence.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief filed in the trial court where a full evidentiary hearing can be conducted. State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, Howard v. Louisiana, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Holmes, XXXX-XXXX (La.App. 4 Cir. 4/25/01), 787 So.2d 440.
Ineffective assistance of counsel claims is reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient and (2) he or she was prejudiced by the deficiency. State v. Jason, 2000-2125 (La.App. 4 Cir. 4/4/01), 787 So.2d 373. Counsel's performance is ineffective when it is shown that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, 97-2061 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel's deficient performance will have prejudiced the defendant if the defendant shows that the errors were so serious as to deprive him or her of a fair trial. To carry his or her burden, the defendant *307 must show that a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236, writ denied, 99-1982 (La.1/7/00), 752 So.2d 175.
In this case, the defendant was convicted of second degree murder, a violation of La. R.S. 14:30.1, which carries a mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. She argues that the sentence is excessive as applied to her and that the trial court failed to comply with the provisions of La.C.Cr.P. art. 894.1(C) when it imposed the sentence.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir.1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, 677. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 656 So.2d at 979; State v. Washington, XXXX-XXXX (La.App. 4 Cir. 7/18/01), 793 So.2d 376.
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Harris, XXXX-XXXX (La. App. 4 Cir. 4/18/01), 787 So.2d 420. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Robichaux, XXXX-XXXX (La.App. 4 Cir. 3/14/01), 788 So.2d 458. In State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, this court stated:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D); 708 So.2d at 819.
In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is "`whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" *308 State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La.1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La.1979), a remand for resentencing is appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).
Id., (citations omitted)
In State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, the defendant argued that his mandatory life sentence for second-degree murder was excessive under State v. Dorthey, 623 So.2d 1276 (La.1993). This court rejected the defendant's argument, stating:
When a trial judge determines a sentence from a carefully tailored penalty statute, such as La. R.S. 14:30.1(B), there is a strong presumption that the sentence is within constitutional parameters. Appellant has not succeeded in proving and the record does not clearly show that under the facts of this case the trial judge abused his sentencing discretion.
Id., 669 So.2d at 526.
Although the trial judge in this case did not articulate the basis for sentencing the defendant to life imprisonment, the record fully supports the sentence. The seventy-seven year old victim was murdered during the course of a kidnapping and/or simple robbery. The defendant masterminded and/or participated in the scheme "to get" the victim. She knew that the victim suffocated because duct tape covered her mouth and nose. The defendant admitted in her statement that from 6 January 1997 until her arrest on 28 January 1997, she saw the victim's body at various times and locations, yet she did not contact the police. After her arrest, she directed the police to the victim's remains. Forensic evidence placed the defendant in direct contact with the body. Moreover, from the date the defendant admitted last seeing the victim alive, 6 January 1997, until her arrest, the defendant aggressively depleted the victim's bank accounts. Fingerprint evidence conclusively implicated the defendant in the theft of the victim's funds.
This assignment is without merit.

OTHER MATTERS
Subsequent to the record being lodged in this Court, the State has filed a motion to supplement the record with the defendant's videotaped statements. The State acknowledges that the tapes were not transcribed by the court reporter, but asserts that they were played in their entirety for the jury.
The defendant objects to the State's request to supplement the record pointing out that the tapes do not contain exhibit numbers; therefore, the defendant asserts that this Court cannot be certain what tapes were viewed and heard by the jury at trial of this matter.
Detectives Deal and Harris testified at trial that they took two statements from the defendant, the first on 28 January *309 1997 and the second on 30 January 1997. Upon viewing the videotapes, the date and time the statements were taken are readily apparent. The videotaping system automatically date and time stamped the tape as recording began. On the tapes, Detective Deal identifies himself, Detective Harris, and the defendant. He further notes the date and time the recording is begun. No doubt exists that the videotapes[8] with which the State seeks to supplement the record are those played for the jury. The defendant's objection is without merit. Accordingly, we grant the State's motion to supplement the record.

CONCLUSION
The conviction and sentence are affirmed and the State's motion is granted.
CONVICTION AND SENTENCE AFFIRMED; MOTION GRANTED.
NOTES
[1] Coston was tried separately and acquitted by a jury. This appeal deals only with Bunley's conviction.
[2] The 23 June 1998 minute entry indicates that a discussion among the jury panel about a prospective juror was the basis for the trial court's declaring a mistrial. The juror was to be a witness for the prosecution.
[3] Sullivan pled guilty to the charge and was sentenced to thirty months.
[4] In a later search of the residence, two canines from the Special Operations Division of the St. Tammany Parish Sheriff's office "signaled" in the room where Sullivan said he had seen what he believed was the victim's body in mid-January 1997.
[5] Bunley claimed she followed Coston's orders because she feared him. Allegedly, he had threatened her with a gun on previous occasions.
[6] Neither of the two Special Operation canines "signaled" while searching Coston's or Sullivan's vehicles.
[7] The trial court performed an in camera inspection of the photographs prior to the pretrial hearing on their admissibility. The defense took the position that because the photographs did not show the cause of death, they had no probative value. The trial judge ruled the photos admissible as the means by which the coroner "can explain why he can't show an entry wound or cerebral hemorrhage or slit throat or whatever because of the fact that this body was burned."
[8] The State delivered five tapes in five envelopes. Each of the envelopes bears a handwritten inscription identifying its contents. One envelope contains Sullivan's videotaped statement. The other four envelopes hold the videotaped statements given by the defendant. The explanation for four tapes of the defendant's two statements is that dual recordings were made of each statement, one from behind the defendant and the other from the front.