854 So.2d 429 (2003)
STATE of Louisiana
v.
Audrey BELL.
No. 2002-KA-2349.
Court of Appeal of Louisiana, Fourth Circuit.
August 6, 2003.
*430 Eddie J. Jordan, Jr., District Attorney, Anne M. Dickerson, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge DAVID S. GORBATY).
DAVID S. GORBATY, Judge.
Audrey M. Bell appeals her conviction for manslaughter and her sentence of forty years at hard labor. For the following reasons, we affirm the conviction and sentence.

STATEMENT OF THE CASE:
Defendant Audrey M. Bell was charged on May 16, 1996 with second-degree murder, a violation of La.Rev.Stat. 14:30.1. She was found guilty as charged in a trial by jury on April 9, 1997. On appeal, this Court reversed the conviction because of the unavailability of a trial transcript, and remanded the case for a new trial.[1]
*431 On March 24, 1999, Ms. Bell filed a motion for a speedy trial. On that date the trial court continued the proceedings in order to prepare transcripts from the first trial and forward them to this Court. At a status hearing on April 14, 1999, the trial court noted that the transcripts still had not been sent to this Court. The trial court continued to hold status hearings. This Court denied defendant's writ application on June 25, 1999, relative to defendant's motion for release without bail.[2] The Louisiana Supreme Court granted defendant's writ application as to the same matter on October 13, 1999, ordering the trial court to commence retrial within sixty days or release defendant without bail.[3] Ms. Bell filed a motion to quash the indictment on December 6, 1999, which was denied. This Court denied an application for emergency supervisory writs and a stay on that same date.[4] Ms. Bell was retried on February 1, 2000, and a twelve-person jury found her guilty of manslaughter. The trial court sentenced Ms. Bell on March 17, 2000 to forty years at hard labor, and granted a motion for appeal on that same date. The trial court denied a motion to reconsider sentence on April 7, 2000.

FACTS:
Audrey M. Bell was convicted of manslaughter in the stabbing death of her lover, Gail Hudson-Kelly.
Dr. Susan Garcia, qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy of the victim. The victim had a knife protruding from her neck region. Upon removing the knife, the coroner noted that the tip of the blade had broken off in one of the cervical vertebra. There was one other stab wound in the neck region, and what appeared to be a telephone cord, tied with a half-square knot in the back, was wrapped around the victim's neck. The cause of death was blood loss from the stab wound to the jugular vein and asphyxia from the wrapping of the telephone cord tightly around the victim's neck. The victim was alive, though not necessarily conscious, when the telephone cord was wrapped around her neck. There was an abrasion to the victim's neck from the telephone cord. Dr. Garcia saw no defensive injuries.
It was stipulated that if criminalist Teresia Lamb were called to testify, she would be qualified as an expert in the testing and identification of blood and blood typing; that she would testify that she tested clothing items from defendant and the victim; and that both contained stains of the same blood type.
New Orleans Police Officer Rita M. Irving testified that she stopped Ms. Bell in the 2700 block of Piety Street on April 8, 1996, and arrested her after discovering an unrelated outstanding warrant for her arrest. Ms. Bell was advised of her rights, and waived them. After arriving at central lockup, Ms. Bell thrust her keys at Officer Irving, telling the officer that her lover might be at her house, and that she thought she was dead. Ms. Bell subsequently asked the officer if she could write two letters. Officer Irving read the letters to the court. The first one, addressed to "Whom It May Concern," read:
The reason this crime took place was because of love. I loved her so much that I didn't want to see her with anyone *432 else. She wanted to play games and I wasn't standing for it. My emotions are not to be played with. She used me up and took me for granted, so I took her life, which I told her I would do. I guess she didn't believe me.
The first letter was signed "Audrey Bell," with the date and time. The second letter was addressed to Ms. Bell's mother:
Dear Mom, I'm so sorry I'm putting you through so much hell, but I didn't wantI did what I had to do. I was tired of making foolI was tired of her making a fool of me, so I put a stop to it the best way I knew how. Please, don't cry over it. I know what I've done and I'm going to do my time. If I'm given the death penalty, please don't cry. I feel like it's my time to go. Tell Sandra, Lupe and Raynell that I love them. Now, you don't have to worry about me getting killed on the streets or by her family. I love you. Love always, Audrey.
Officer Irving turned the letters over to a homicide detective. Officer Irving replied in the negative when asked whether she noticed any injuries on defendant. However, she noted that Ms. Bell did have what appeared to be bloodstains on her pants and shoes.
Officer Irving confirmed on cross-examination that Ms. Bell was in a "dazed state" when stopped. Officer Irving said on redirect examination that her partner, Officer Bevley, had to keep telling Ms. Bell to sit down because she kept getting up from her seat. Ms. Bell argued with Officer Bevley, and at one point told the officer that she was a black belt in karate, and: "I just did my lover, and I'll do you, too."
New Orleans Police Sergeant Michael Glasser and two other officers let themselves into 3211½ Gravier Street with the keys Ms. Bell had given Officer Irving. They found the dead body of a female in the second room of the dwelling.
New Orleans Police Detective David Gaines investigated the homicide. The victim was located in the bedroom. The handle of a knife was protruding from the right side of the victim's neck, and a telephone cord, tied in a knot, was wrapped around her neck. After the initial scene investigation, Det. Gaines returned to the homicide office and interviewed Ms. Bell. He said she did not appear dazed or confused. Det. Gaines testified on cross-examination that he also recovered an unopened male condom from the bedroom area of the homicide scene. He noted that the victim had the name "Augie" tattooed on her; "Augie" was Ms. Bell's nickname. It was the detective's belief that the victim's children lived at the residence. None of the furniture in the residence was disturbed. Based on Ms. Bell's statements, interviews of witnesses, and physical evidence, Det. Gaines charged Ms. Bell with second-degree murder.
New Orleans Police Sergeant Kenneth Harris interviewed Ms. Bell at the homicide office. Sgt. Harris said Ms. Bell appeared to be calm, composed and forthcoming. She did not have any visible physical injuries. Ms. Bell signed a waiver of rights form and gave a statement. She said she picked the victim up from work on Easter Sunday, and they went to 3211½ Gravier Street, where the two lay down to rest. They started arguing about the victim seeing other people and Ms. Bell's violent temper. She said the victim did not threaten her or hit her during the argument. Ms. Bell stated that "I just went and I got an extension cord and I did what I had to do." The victim was sitting in a chair when Ms. Bell wrapped the telephone cord around the victim's neck from behind. When the victim fell to the floor, Ms. Bell picked up knife she said *433 was under a table and stabbed the victim in the neck. Ms. Bell recalled stabbing the victim four or five times, and then left.
Byron Hudson, the victim's son, was 10 years old at the time of the second trial. He testified that Ms. Bell had lived with him and the victim up until Good Friday, but apparently did not sleep at the home the Saturday before Easter. Ms. Bell took him to an Easter egg hunt on Easter Sunday. They later picked his mother up, and came home. Byron went to his grandmother's home around the corner to pick up his Easter candy, and when he returned approximately ten minutes later, his mother was dead.
Misty Clesi was called as a defense witness. She testified that she had known Ms. Bell for approximately four years at the time of the second trial. She had known the victim for one year before the killing. All three women worked at the Jefferson Health Care Center. Ms. Clesi said she and Ms. Bell had lunched at Clesi's home, and sometimes went shopping together. The victim and Ms. Bell had been to Ms. Clesi's home together a couple of times, and she had invited them to her wedding. The two women did not come because, Ms. Bell later told her, they had an argument. Ms. Bell often had the victim's children with her, and Ms. Clesi described her as like another mother to the children. The Easter egg hunt Byron Hudson attended with Ms. Bell on the day of the killing was at the Jefferson Health Care Center.
Audrey M. Bell, thirty-four years old at the time of trial, testified in her own behalf. She and the victim were lovers for approximately eighteen months. They moved in together at 3211½ Gravier Street while the victim was still married, and they lived together there for eighteen months. Complications arose some nine months into the relationship. They regularly argued and fought, and separated at times it was "back and forth." Ms. Bell testified that she was the director of activities at the Jefferson Health Care Center. She went to work on Good Friday. The victim was off that day. After receiving a telephone call at work, Ms. Bell telephoned her mother and asked her to pick her up.[5] Ms. Bell spent that night at her mother's home. The victim telephoned her at approximately 2:30 a.m. Easter Sunday morning. Ms. Bell went to the Gravier Street residence, arriving at 3:00 a.m., and she and the victim talked about why the victim had not picked up Ms. Bell from work on Friday. Ms. Bell testified that she called her mother and sister afterward to pick her up, but neither would come. At approximately 6:45 a.m., Ms. Bell and the victim's son dropped the victim at her job on Canal Street. Ms. Bell then returned to Gravier Street where she packed up some of her things. She and Byron then went to an Easter egg hunt at the Jefferson Health Care Center. She and Byron left at 3:00 p.m. to pick up the victim from work.
She and the victim went to the Gravier Street residence and took a nap. When they awoke, Ms. Bell expressed her intention to return to live at her mother's home. The two women began arguing. Ms. Bell began packing up the rest of her things, and in the process came across a Blockbuster video store bag. The time and date on the receipt inside coincided with the time she got off work on Good Friday. The victim had told Ms. Bell she could not pick her up from work that day because her grandmother was sick and she had to take her to the hospital. A western movie was inside of the Blockbuster bag. Ms. Bell questioned the victim about the movie. *434 Byron explained that the victim had rented the movie for Keith, a man the victim apparently was seeing, and that the three of them watched the movie.
The two women asked Byron to go outside and continued arguing. The victim went into the kitchen to get a knife. Meanwhile, Ms. Bell had picked up a telephone cord, which belonged to her sister, planning to take it with her when she moved out. Ms. Bell had the cord draped over her shoulder. The arguing continued. Ms. Bell testified that she made a move toward the victim, who raised the knife she was holding. Ms. Bell asked if she would really try to stab her, and the victim replied that she would. At that point Ms. Bell ran behind the victim and put the telephone cord around her neck. The two fell to the floor, and the victim dropped the knife. When the victim reached for the knife, Ms. Bell squeezed the cord around the victim's neck. Ms. Bell said she squeezed the cord a little tighter, picked up the knife, and stabbed the victim in the neck. She did not recall how many times she stabbed the victim.
Ms. Bell denied on cross-examination that she threatened Officer Bevley, as reported by Officer Irving. She stated that at the time she spoke with Officer Bevley, she was not aware that the victim was dead; therefore, she would not have made that statement. She admitted writing the two letters and confirmed that the letters reflected how she felt at the time she wrote them. When asked about her subsequent statement to Sgt. Harris, Ms. Bell said she told him what she wanted him to know. She admitted that she told Sgt. Harris that the telephone cord was on the floor, that the knife was under the bed, and that the victim did not threaten her. She denied that was the way it happened. She said she was feeling guilty at the time she gave the statement to Sgt. Harris, and she did not care whether she lived or died. Ms. Bell denied being in trouble before, but admitted that Officer Irving had arrested her on an outstanding warrant.

ERRORS PATENT:
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1:
In her first assignment of error, Ms. Bell argues that the trial court erred in denying her motion to quash the indictment, based on the expiration of the time limitation in La.Code Crim. Proc. art. 582.[6]
Louisiana Code of Criminal Procedure art. 582 states that when a defendant obtains a new trial, the State must commence it within one year from the date the new trial is granted, or within the period established by La.Code Crim. Proc. art. 578, whichever is longer. Under La.Code Crim. Proc. art. 578(2), no trial shall be commenced in a non-capital felony case after two years from the date of the institution of prosecution. When a defendant brings an apparently meritorious motion to quash based on prescription, the State bears a heavy burden of demonstrating either an interruption or a suspension of the time limitation such that prescription will not have tolled. State v. Rome, 93-1221, p. 3 (La.1/14/94), 630 So.2d 1284, 1286; see also State v. Brent, XXXX-XXXX, p. 6 (La.App. 4 Cir. 11/29/00), 775 So.2d 565, 569.
This Court reversed Ms. Bell's original conviction and remanded the matter for a new trial on October 21, 1998, because of the unavailability of a trial transcript necessary *435 for appellate review. The second trial did not commence until February 1, 2000, more than one year and three months after the grant of a new trial, and more than two years from the institution of the prosecution.
Louisiana Code of Criminal Procedure art. 583 states that the one-year period of limitation established by La.Code Crim. Proc. art. 583 shall be interrupted by any of the causes stated in La.Code Crim. Proc. art. 579. La.Code Crim. Proc. art. 579 states the period of limitation established by La.Code Crim. Proc. art. 578 shall be interrupted if, among things, the defendant cannot be tried because of any cause beyond the control of the State. Interruption of prescription in such a case has been held to require an action or inaction by the defendant that inures to his benefit, such as the filing of motions or pleadings that delay the prosecution. State v. Williams, 93-694, p. 6 (La.App. 5 Cir. 2/9/94), 631 So.2d 1370, 1373.
In the instant case, on May 25, 1999, Ms. Bell moved the trial court to release her without bail on the ground of a statutory speedy trial violation. The trial court denied her motion, and she applied to this court for supervisory review. The trial court minute entry from June 18, 1999 reflects that Ms. Bell appeared for a status hearing that date, but that the court was waiting on a response from this Court relative to defendant's writ application. This Court denied the writ application on June 25, 1999, finding no error in the trial court's ruling.[7] Ms. Bell sought review of this Court's ruling from the Louisiana Supreme Court. A trial court minute entry of July 30, 1999 reflects that Ms. Bell appeared for a status hearing that date, but that the trial court was waiting on a response from the Louisiana Supreme Court. The same notation is present in the minute entry for September 13, 1999. The minute entry for October 1, 1999 reflects that the Louisiana Supreme Court ordered the State to respond to Ms. Bell's writ. The State filed a motion for a stay order, which the trial court granted. The Louisiana Supreme Court rendered its decision on October 13, 1999, granting the writ and ordering the trial court to either commence Ms. Bell's retrial within sixty days or release her without bail.[8]
All of these actions by Ms. Bell, from the filing of her motion on May 25, 1999 for release without bail, to her seeking review in this Court and in the Louisiana Supreme Court, inured to her benefit. One or more of these acts by defendant constituted a delay of trial for a cause beyond the control of the State, as contemplated by La.Code Crim. Proc. art. 579(A)(2), and, accordingly, interrupted the tolling of the time limitation of La.Code Crim. Proc. art. 582. La.Code Crim. Proc. art. 583 states that where such interruption occurs, the State has one year from the date the cause of interruption no longer exists to commence the retrial. Ms. Bell's February 1, 2000 trial was within one year from the date she filed her initial motion on May 25, 1999, and well within one year from the date the Louisiana Supreme Court finally ruled on the matter on October 13, 1999.

ASSIGNMENT OF ERROR NO. 2:
In her second assignment of error, Ms. Bell claims that her forty-year sentence is unconstitutionally excessive.
Louisiana Constitution. art. I, § 20 explicitly prohibits excessive sentences. State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. A sentence is constitutionally *436 excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677, citing State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2982 at p. 9, 656 So.2d at 979, quoting State v. Lobato, 603 So.2d 739 (La.1992); State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217. Courts have the power under La. Const. art. I, § 20 to declare to a sentence excessive, although it falls within the statutory limits provided by the legislature. Johnson, 97-1906, p. 6, 709 So.2d at 676. When a trial court determines a sentence from a carefully tailored penalty statute, such as the statute applicable in the instant case, La.Rev.Stat. 14:31, there is a strong presumption that the sentence is constitutional. State v. Bunley, XXXX-XXXX, p. 24 (La.App. 4 Cir. 12/12/01) 805 So.2d 292, 308, writ denied, XXXX-XXXX (La.1/24/03), 836 So.2d 41. The penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2982 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La. App. 4 Cir.1987).
In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines set forth in La.Code Crim. Proc. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Robinson, 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127. If adequate compliance with La.Code Crim. Proc. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762; State v. Bonicard, 98-0665, p. 3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185.
Audrey Bell was sentenced to forty years at hard labor, the maximum sentence provided for a person convicted of manslaughter. La.Rev.Stat.14:31(B).
Defense counsel argued at sentencing that this was a provoked incident, but admitted that it was not a self-defense case. Counsel said Ms. Bell admitted at trial that she was wrong and expressed her remorse. Counsel noted that the relationship between Ms. Bell and the victim had been violent and self-destructive. Counsel incorrectly stated that Ms. Bell had never been arrested. However, the record reflects that she was initially taken into custody on an outstanding arrest warrant for, according to the prosecutor, unlawful use of a movablethe victim's car. Counsel noted that Ms. Bell had no history of violence, except in her relationship with the victim. Ms. Bell was liked by at least one person at her place of employment, Ms. Clesi, and had gotten along well with the victim's two children.
The State argued that there are two motherless children because Ms. Bell chose to play God and take another life. Ms. Bell wrote in one of her letters that she killed the victim because she loved her so much that she did not want to see the victim with anyone else, and because the victim "wanted to play games," and defendant "wasn't standing for it." Ms. Bell *437 defiantly stated in the letter that "my emotions are not to be played with. She used me up and took me for granted, so I took her life, which I told her I would do. I guess she didn't believe me."
The court stated that it had considered the mitigating circumstances cited by defense counsel. The court said that there was too much violence in the community, and that the killing was a vicious act strangling the victim and stabbing her twice in the neck.
In State v. Lanieu, 98-1260 (La.App. 1 Cir. 4/1/99), 734 So.2d 89, the court affirmed a forty-year sentence for manslaughter imposed on a nineteen-year-old first offender. The defendant and the victim argued and cursed each other before the defendant reached into the victim's car through the passenger side window and shot the victim twice in the head. The court noted that, although either wound would have been fatal, a witness testified that there was a pause of one to three minutes between the first and second shots. The defendant fled the scene in the victim's vehicle, dumped the body in a field, and was subsequently arrested after a high-speed chase. The court noted that the defendant received a benefit when the jury convicted him of the lesser offense of manslaughter, as the court believed the facts were sufficient to convict him of the charged offense of second-degree murder.
In State v. Taylor, 535 So.2d 1146 (La.App. 2 Cir.1988), decided when the maximum sentence for manslaughter was twenty-one years, the court held that an eighteen-year sentence was excessive. The defendant and his victim had known each other for several years. The defendant rented a vehicle and later entrusted it to the victim to return. The victim used the vehicle for an additional ten days, and the defendant's credit card was billed for an extra $400. The victim had repaid the defendant $75 at the time of the homicide. The defendant left a bar at 2 a.m. one morning, after earlier drinking with the victim. He went to the victim's home, armed with a rifle, to demand full repayment. The defendant entered the victim's residence and shortly thereafter fired one fatal shot into him. The defendant maintained that he accidentally shot the victim. The defendant subsequently called 911, but fled before reporting the shooting because he was afraid. He was charged with second-degree murder, but pleaded guilty to manslaughter. On appeal of the sentence, the court noted the circumstances and speculated that alcohol was probably a substantial factor in the killing. The court noted that the defendant's mother, sister and cousin all testified to the defendant's peaceable attributes, which testimony was corroborated by the mother of the defendant's former girlfriend. The defendant was a first-felony offender with no prior criminal history. He was viewed as a good employee at a paper company, and had been under review for advancement. The court concluded that the defendant was not one of the worst offenders and should not have received the near-maximum sentence. It found that anything over twelve years would be excessive.
In State v. Maxie, 594 So.2d 1072 (La. App. 3 Cir.1992), the court held that a maximum twenty-one year manslaughter sentence imposed on a defendant originally charged with second-degree murder was not excessive. The defendant had accused the victim, an acquaintance, of stealing $600 worth of stereo equipment from his car. Earlier on the day of the killing, the two argued and the victim threatened the defendant with a knife. Later, the defendant was driving out of his apartment complex lot when the victim threw down his jacket and began walking toward the defendant's car. The defendant parked *438 his car and exited, armed with a .22 caliber semi-automatic rifle. After an exchange of words, the defendant shot the victim four times, killing him. Police found the victim's opened knife nine feet from his body. The defendant testified that the victim approached him, threatened him with a knife, and continued to approach after the first shot struck him in the leg. This testimony was corroborated by the defendant's girlfriend and her two brothers. Two additional witnesses testified they observed a closed knife near the victim's body. Four witnesses testified the victim was unarmed. Another said the victim tried to dodge the bullets fired by the defendant.
The trial court noted that the defendant had never been convicted of another crime, that he was only twenty-two years old, and that he had a steady employment record, although he did not provide support for his two illegitimate children. The court believed the defendant acted without provocation. In affirming the sentence, the appellate court found that the defendant could have easily avoided the confrontation and had overreacted by arming himself with the firearm.
In the instant case, as in Lanieu, Ms. Bell received a benefit when the jury convicted her of the lesser offense of manslaughter, as it appears the evidence would have supported a conviction for the offense charged, second-degree murder. One of the letters written by Ms. Bell shortly after the incident and her subsequent statement to Sgt. Harris damn her. The letter evidences that, rather than acting in the heat of passion, defendant acted with cool detachment, killing the victim because she felt wronged and because she wanted to ensure that if she could not have the victim, no one else would. Ms. Bell admitted in her letter that she had previously threatened to kill the victim, but that the victim apparently had not believed her. She calmly told Sgt. Harris that she did what she "had to do." While the trial court said it would "honor" the jury's manslaughter verdict, it is apparent that the court believed the circumstances of the case would have justified a second-degree murder conviction, the crime for which Ms. Bell had originally been charged in the case. The victim's son, Byron, who would have been approximately four years old at the time of the killing, came home from his grandmother's house on Easter Sunday to find his mother dead, with a telephone cord wrapped around her neck and a knife protruding from her neck.
It cannot be said that the maximum sentence imposed for this manslaughter conviction is too severe in light of the particular defendant and the circumstances of the case.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] State v. Bell, unpub., 97-1615 (La.App. 4 Cir. 10/21/98).
[2] State v. Bell, unpub., 99-1449 (La.App. 4 Cir. 6/25/99) (no error by the trial court).
[3] State v. Bell, 99-1971 (La.11/13/99), 748 So.2d 458.
[4] State v. Bell, unpub., 99-3030 (La.App. 4 Cir. 12/6/99), writ denied, 99-3048 (La.12/7/99), 751 So.2d 239.
[5] It is not clear from the record from whom the call was received.
[6] Ms. Bell does not argue that her Sixth Amendment right to a speedy trial was violated.
[7] State v. Bell, unpub., 99-1449 (La.App. 4 Cir. 6/25/99).
[8] State v. Bell, 99-1971 (La.11/13/99), 748 So.2d 458.